## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JUDY K. KELLEY,

       Plaintiff,

vs.                                   No. CIV 03-0507 JB/ACT

CITY OF ALBUQUERQUE,
a municipal corporation,
ROBERT M. WHITE,
and MARTIN J. CHAVEZ,

       Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on the Defendants' Motion for Summary Judgment, filed February 2, 2004 (Doc. 31 and 32). The primary issue is whether Plaintiff Judy K. Kelley's participation as a defense lawyer in a mediation involving Title VII claims is protected activity under the statute. The Court held a hearing on this matter on July 12, 2004, and orally ruled that Title VII's plain language compelled the Court to find Kelley's actions protected conduct. Consistent with the Court's ruling at the hearing on this motion and the reasons for that ruling given at the time of the hearing, the Court will deny the Defendants' motion in part and grant the motion in part.

## FACTUAL BACKGROUND

The City of Albuquerque ("the City") hired Kelley as an assistant city attorney in May, 1985. See First Amended Complaint ¶ 7, at 2, filed Sept. 11, 2003 (Doc. 18). The City employed Kelley for sixteen plus years through four administration changes. Kelley was an assistant city attorney under Mayors Harry Kinney, Ken Schultz, Louis Saavedra, Defendant Martin J. Chavez (first administration), and Jim Baca. See Declaration of Judy K. Kelley, Additional Facts ¶ 4, at 6-7

(executed February 9, 2004)(hereinafter "Kelley Decl. Add. Facts").

**I.**      **STRUCTURE OF THE CITY ATTORNEY'S OFFICE.**

>   **A.**      **AUTHORITY TO MAKE PERSONNEL DECISIONS AS TO UNCLASSIFIED EMPLOYEES.**

Kelley alleges that only the Chief Administrative Officer ("CAO") can terminate a city attorney's employment. See City of Albuquerque Ordinance §§ 3-1-2(B),(C)(2),(C)(3); id. § 3-1-6(D). The Albuquerque Charter prohibits the mayor from being involved in personnel matters except unclassified positions "directly responsible to the Mayor."  Charter of the City of Albuquerque, Article X, § 2(b)("[T]he Mayor is prohibited from becoming involved in the hiring, promotion, demotion, or discharge of any city employee except those personnel hired for unclassified positions directly responsible to the Mayor.").  Although Chavez testified that he was not sure if the department heads have the power to hire and fire unclassified employees, see Martin J. Chavez' Deposition at 59:1-7 (taken December 17, 2003)(hereinafter "Chavez Depo."); id. at 20:24 - 21:6, he also stated that he believed the City Attorney has to consult with him before hiring and firing assistant city attorneys, see id. at 22:1-25, 26:12-18.  Moreover, when asked if an assistant city attorney "serve[d] at the pleasure of the CAO and not the Mayor," Chavez responded that he did not know the technical answer to that question, but that "we all serve at the pleasure of the mayor."  Chavez Depo. at 59:1-25.  Chavez testified that he does not expect assistant city attorneys to "support" his philosophies, but only to work hard; however, he does expect department directors to "support" him.  Chavez Depo. at 59:12-25; id. at 28:6-11; id. at 32:23-25; id. at 37:11-20.

The mayor hires the City Attorney with the city council's advice and consent.  See Charter of the City of Albuquerque, Article V, § 4(d).  The Charter provides:

> The Mayor shall: . . . . (d) With the advice and consent of the Council, hire or appoint the City Attorney, an officer to administrator the merit system, and all other senior administrative or cabinet level officers of the city, including without limitations any chief, assistant or deputy administrative officers, and specify the duties and responsibilities of those officers; . . . .

Id.  See City of Albuquerque Ordinances § 2-7-2-3 ("The City Attorney shall be appointed by the Mayor with the advice and consent of the Council.").  The mayor also hires directors of all city departments.  See Charter of the City of Albuquerque, at Chapter V, § 4(b); City of Albuquerque Ordinances § 1-1-5(B)(defining "Mayor" as "[t]he elected officer of the city who exercises administrative control and supervision over the city and hires or appoints directors of all city departments . . .").

Under the City Personnel Ordinance, assistant city attorneys are unclassified employees of the City -- which are at-will employees.  See City of Albuquerque Personnel Rules and Regulations 306.2(D) at 300-11 (effective February 1, 2001); City of Albuquerque Ordinance § 3-1-6(D).  As an unclassified employee, a city attorney is exempt only from the grievance portions of the City Ordinance.  See Albuquerque Ordinance 3-1-6(E)("All employees in the unclassified service shall be entitled to all of the rights and benefits to which classified employees are entitled except the benefits provided for in [§]§ 3-1-23, 3-1-24, 3-1-25. . . .").

The City Attorney is a department director whom the mayor selects and the city council confirms.  See id. ¶ 7, at 7.  The City Attorney reports directly to the CAO and the mayor.  See id.  If Kelley was working on any legal matter in which the CAO or mayor had an interest, she gave information to the City Attorney and he used that information to advise the CAO and mayor.  See id.

According to Kelley, the City of Albuquerque has formally granted only the City Attorney the

power to advise the Mayor and the Council as to legal matters.  See City of Albuquerque Ordinances §§ 2-7-2-1, 2-7-2-2.  Section 2-7-2-1 states: "The executive and administrative head of the Legal Department shall be the City Attorney."  Section 2-7-2-2 states: "The City Attorney, both personally and through his or her assistant city attorneys, shall represent the city in the courts.  He or she shall also advise the Mayor and the Council as to legal matters."  Kelley contends that a reasonable reading of this ordinance is that the City Attorney or his assistants may represent the City in the courts, but the City Attorney advises the mayor and the Council.

City attorneys provide legal advice on all issues concerning development and implementation of city policy, including policies relating to housing, land use, code enforcement, utility franchises, contracts, and city personnel, as well as the powers of the city council and the mayor's office.  See Affidavit of Bob White ¶¶ 2, 4 at 1 (executed Jan. 27, 2004)(hereinafter "White Aff.").  City attorneys advise all of the city's policymakers, including the mayor, city council, department directors, boards, and commissions.  See id. ¶ 3, at 1; Deposition of Robert M. White at 22:14 - 23:9 (taken January 27, 2004)(hereinafter "White Depo."); Kelley Decl. Add. Facts ¶ 6, at 7.  Kelley notes that Robert M. White, City Attorney for the City of Albuquerque and Director of the Legal Department, states in his affidavit that the attorneys advise the policymakers, not that the attorneys are the policymakers.  See Declaration of Judy K. Kelley ¶ 8, at 2 (executed Feb. 9, 2004)(hereinafter "Kelley Decl."); White Aff. ¶ 2, at 1; City of Albuquerque Ordinances §§  2-7-2-2, 2-7-2-3 (describing the duties of the city attorney and the assistant city attorneys is to "advise the Mayor and the Council as to legal matters.").  Although Assistant city attorneys provide legal advice, Kelley contends that legal advice is not policymaking.  See Kelley Decl. ¶ 7, at 2.  Kelley alleges that the legal advice that the city attorneys give is no different than the advice that a corporate attorney gives her client; it is still the CEO,

-4-

president, or board of directors who are the policymakers by deciding what to do with the advice. See id.

Kelley alleges that all the City Attorneys for whom she worked frequently reminded the assistant city attorneys that they are not policymakers. See Kelley Decl. Add. Facts ¶ 6, at 7. Kelley alleges that White consistently took the position that assistant city attorneys are limited to providing legal advice and are not to become involved in policymaking. See id. Kelley also contends that White frequently stated that any policymaking that came from the City Attorney's office would come from him, not the assistant city attorneys. See id.

Kelley contends that, as an assistant city attorney, she gave legal advice on a variety of issues, but primarily on personnel issues. See id. ¶ 8, at 7. Kelley usually gave advice to mid-level managers. See id. Occasionally, she advised a department director. See id. Kelley rarely gave legal advice to, or had a meeting with, the CAOs under whom she served. See id.; id. at ¶ 5, at 7. Kelley did not give legal advice directly to a mayor. See id. at ¶ 2, 7 at 5-6, 7.

Kelley was one of some thirty attorneys in the office of the city attorney. See Kelley Decl. Add. Facts ¶ 1, at 5. The head of the litigation department, John Pope, selected Kelley for the position of assistant city attorney in 1985. See Kelley Decl. Add. Facts ¶ 4, at 6. The City Attorney, Human Resources Director, and CAO approved her hiring. See id. During that hiring process, Kelley met with only two individuals, Pope and then-City Attorney Gary O'Dowd. See id. She did not meet with the mayor at the time, Harry Kinney, when she was hired, nor did Kinney sign Kelley's hiring papers. See id.

**B.    RELATIONSHIP BETWEEN ASSISTANT CITY ATTORNEYS AND THE MAYOR.**

Kelley alleges that she had minimal contact with the Albuquerque mayors during her employment.  See Kelley Decl. Add. Facts ¶ 5, at 6.  Kelley alleges that her relationship with all mayors, including Chavez, was not as part of the mayor's personal staff.  See id. ¶ 4, at 6.  Nor did any mayor appoint her to a policymaking position or to be an immediate advisor to the mayor on the constitutional or legal powers of his office or of the City.  See id.  Kelley did not have any meetings with prior mayors in which she advised them on city policy, on the City's legal or constitutional powers, or on the mayor's office powers.  See id.  She did not work closely with any of the mayors, including Chavez in his first administration.  See id.

 With the exception of office social functions, Kelley's only contact with Chavez during his first term was attending the same baseball game.  See id. ¶ 2, at 5-6. Kelley does not think that any mayor other than Chavez knew who she was when they passed her in the hallway or on the street. See Kelley Decl. Add. Facts ¶ 5, at 6-7.  Kelley alleges that Chavez knew Kelley only because -- like Kelley -- Chavez is an attorney.  See id.  Chavez did not know in what field of expertise Kelley worked as an assistant city attorney, and he cannot recall any private conversations with her during his first term.  See Chavez Depo. at 34:1-14; id. at 35:2-8.

The Defendants allege that Chavez interacts with the city attorneys and, especially during his second term in office, works much more closely with the city attorneys than in his first term.  See White Depo. at 42:18-24.  The Defendants also contend that Chavez currently uses the assistant city attorneys for advise on city policy, including the legal powers of the mayor's office.  See White Aff. ¶ 4, at 1.  Kelley, however, alleges that her relationship with Chavez was similar to that of the other

mayors.  See Kelley Decl. Add. Facts ¶ 5, at 6-7.  During his first term, Chavez admits that he did not

ask Kelley for any policy position papers.  See Chavez Depo. at 80:19-23.

###        C.        ASSISTANT CITY ATTORNEYS PARTICIPATION IN REVISING THE PERSONNEL ORDINANCE AND IN SETTLEMENTS.

The City Ordinances provide that the Director of Human Resources has the duty to prepare

and recommend changes in the personnel ordinance to the CAO.  See City of Albuquerque

Ordinances § 3-1-3(B),(G). While working as an assistant city attorney, Kelley participated in

modifying the City Personnel Ordinance, requiring her to apply her legal knowledge and making at

least one presentation to the city council.  See Deposition of Judy K. Kelley at 21:24 - 22:1 (taken

December 11, 2003)(hereinafter "Kelley Depo.").  A committee, which did not include Kelley, met

over a several month period to develop a draft of the revised personnel rules.  See Kelley Decl. Add.

Facts ¶ 9, at 7.  Once a draft was close to final, the committee asked Kelley to provide legal advice

on the revised rules.  See id.  If Kelley could not attend a meeting, the meeting occurred without her.

See id.  Kelley alleges that, during this process, she did not advise the committee, the CAO, or the

mayor on policy issues.  See id.

Kelley participated in revising the personnel ordinance primarily by drafting the grievance

procedure.  See Kelley Depo. at 24:19-22; Kelley Decl. Add. Facts ¶ 10, at 8.  Several members of

upper administration, possibly including the CAO, studied the grievance procedures of other cities

and, based on this information, instructed Kelley on what she should include in the procedures.  See

Kelley Decl. Add. Facts ¶ 10, at 8.  Kelley alleges that her involvement in the changes in the grievance

procedure was as drafter, putting on paper the policy that was given to her and writing it in such a

way that it was legally defensible.  See id.  The City Attorney communicated with the CAO about

what Kelley had written.  See id.  She attended one city council meeting to briefly describe the procedure and answer questions.  See id.

In addition, Kelley advised the City regarding settlement positions.  See Kelley Depo. at 20:3-21.  The Risk Management Division, however, made the decision whether to settle most claims against the City.  See Kelley Decl. ¶ 11, at 8.  The Claims Review Board, which considered some of the larger claims, held meetings that Kelley sometimes attended as a nonvoting member.  See id.  Whenever the claim before the Board was one that she was handling or with which she was familiar, she would provide her legal opinion regarding liability.  See id.  The Board, however, made the decision whether to settle the particular claim.  See id.  Kelley had no input on whether to settle claims against the City that were not within the Board's jurisdiction.  See id.  She never advised a mayor or the city council with regard to settling claims.  See id.

## II.    EQUAL EMPLOYMENT OPPORTUNITY ("EEO") MEDIATIONS.

Kelley has conducted many EEO mediations.  See Kelley Decl. Add. Facts ¶ 14, at 9.  In most of these proceedings, Kelley alleges that the mediator stated that the mediation is an informal proceeding, and encourages the parties to be informal and address each other by their first name.  See id.

In 2000, Kelley represented the City in two EEOC mediation sessions involving a claim of discrimination unrelated to this case.  See Kelley Depo. at 7:19 - 9:17.  Chavez -- then a practicing private attorney between his two terms as mayor -- was opposing counsel in that litigation, representing Steve Chacon.  See id. at 7:19-22; id. at 36:9 - 37:10.  Chavez testified that he and Kelley were "participating" in an EEOC proceeding or investigation.  See Chavez Depo. at 51:19-22.  During the first mediation, Chavez' client made several factual allegations, which Kelley agreed to

have investigated.  See Kelley Decl. Add. Facts ¶ 15, at 9.  Accordingly, the City hired an independent investigator, but the investigator could not substantiate the claims.  See id.

Chavez and Kelley then held a second mediation session on Chacon's discrimination claims. See Kelley Depo. at 7:21-22; Kelley Decl. Add. Facts ¶ 15, at 9-10.  Kelley alleges that, when she told Chavez that the City was unable to substantiate the discrimination claims, Chavez became angry. See Kelley Depo. at 8:20 - 9:8; Kelley Decl. Add. Facts ¶ 14, at 9.  In an attempt to "calm things down,"  Kelley referred to Chavez' client by his first name, "Steve."  Kelley Depo. at 8:20 - 9:8.  In response, Chavez asked her to call his client by his surname.  See Kelley Depo. at 8:20 - 9:8; Chavez Depo. at 46:5-23; Kelley Decl. Add. Facts ¶ 14, at 9.  Kelley apologized, stating that she did not mean to offend anyone.  See Kelley Depo. at 8:20 - 9:8; Kelley Decl. Add. Facts ¶ 14, at 9.  Kelley complied with Chavez' request.  See Kelley Decl. Add. Facts ¶ 14, at 9; Chavez Depo. at 46:14-23.


Kelley then alleges that, when she addressed Chavez as "Marty," he became angry, slammed his file or briefcase on the table, pushed his chair back, and announced the session was over.  Kelley Decl. Add. Facts ¶ 15, at 9-10.  When asked whether he slammed the papers on the table and walked out, Chavez responded, "I don't recall that.  That certainly would be consistent with the way I have had some cases where you put your file on the desk, put stuff up there, and get up and say, ['W]e're done,['], and walk out."  Chavez Depo. at 52:21-25.  Chavez admits that he became upset with Kelley because he thought she was treating his client in a demeaning and an offensive manner,  see id. at 46:9-13, but contends that he did not act in a "loud manner," id. at 52:12-16.

Kelley contends that Chavez became angry and ended the session because she did not agree to a proposed settlement and because of her demeanor with Chavez' client.  See Kelley Decl. Add.

Facts ¶ 15, at 9-10.  Kelley alleges that, during the second EEO mediation session, her demeanor was appropriate to a mediation environment and that she treated Chavez' client with respect.  See Kelley Decl. Add. Facts ¶ 14, at 9.  Kelley asserts that nothing about her conduct warranted Chavez' angry outburst.  See id.

Chavez believes that Kelley's conduct in the mediation sessions was unprofessional and unethical.  See Chavez Depo. at 53:12-16.  He admits that a record of the mediation would not reveal any unprofessional conduct by Kelley; instead, Chavez bases his view of her conduct on his "sixth sense."  Id. at 53:12-22.  Although Chavez found the mediation to be very disturbing, see id. at 80:5-8, he did not seek any disciplinary action against Kelley after the event,  see id. at 80:24 - 81:3.  Chavez contends that he did not discuss what occurred at the mediation with White either after the session or between his two terms as mayor.  See Chavez Depo. at 53:23 - 54:13.  White admitted, however, that Chavez mentioned the EEO mediation incident with Kelley to him sometime during the fall of 2001 in the context of discussing the office's morale.  See White Depo. at 37:10-32.  In this excerpt of his testimony, however, White does not mention the details of Chavez' discussion with White about the EEO mediation incident.  See id.  Chavez also alleges he did not discuss the Kelley termination with Jay Czar, the City's CAO.  See id. at 54:14-21.  Chavez is not aware of any disciplinary action taken against Kelley.  See id. at 56:17-20.

Because of Chavez' abrupt termination of the mediation, Kelley immediately went White and told him about the meeting.  See Kelley Decl. Add. Facts ¶ 16, at 10.  White told Kelley not to worry, because "Marty" appreciates people who stand up to him.  See id.  White had no complaints about Kelley's job performance then or at any other time.  See id.  Kelley did not have contact with Chavez after this mediation session about this case or any other matter until he was re-elected mayor in 2001.

See Kelley Decl. Add. Facts ¶ 17, at 10.  Kelley alleges that, as a result of this experience, Chavez forced her to submit a letter of resignation once he was re-elected mayor -- more than two years after the mediation sessions.  See Plaintiff's Response to Defendants' Motion for Summary Judgment at 21, filed Feb. 27, 2004 (Doc.  38).

III.    **LETTERS OF RESIGNATION AND CHAVEZ' REPLACEMENT POLICY.**

   A.    **CHAVEZ' REQUEST FOR LETTERS OF RESIGNATION.**

Chavez was elected mayor for his second term on October, 2001, and took office as mayor on December 1, 2001.  See First Amended Complaint ¶ 17, at 3; see also Chavez Depo. at 6:2-6 (referring to Chavez' start date as December 1, 2001).  After being elected, Chavez requested letter of resignations of all exempt or unclassified positions in the City, including all assistant city attorneys. See White Depo. at 16:11-14.  Although Chavez did "extensive interviewing" of assistant city attorneys, Chavez Depo. at 25:1-14, Chavez did not interview Kelley, see id. at 26:6-7.

Chavez accepted approximately sixty percent of the requested letters of resignation from the unclassified employees of the City.  See White Depo. at 19:16-20.  Kelley alleges that the decision to accept resignations or request terminations of assistant city attorneys was a combination of White's and Chavez' decision.  See Chavez Depo. at 26:12-18; Response to Request for Information at 3 (showing that the City's EEO response to Kelley's claim states that both White and Chavez determined to dismiss Kelley).  White, however, contends that Chavez told him to let Kelley go without discussion.  See White Depo. at 23:10-20.  Chavez could not recall if White made a recommendation to let Kelley go.  See id. at 29:5-7.  White represented that he had no problem with Kelley's job performance.  See White Depo. at 10:16-25.

Whether to submit a letter of resignation in response to Chavez' request was a topic of much

discussion among the City Attorneys, including Kelley.  <u>See</u> Kelley Depo. at 49:17 - 50:2.  Kelley ultimately decided to submit her letter of resignation.  <u>See</u> Letter of Resignation by Judy K. Kelley to Mayor-Elect Chavez at 1 (dated November 7, 2004)(hereinafter "Letter of Resignation").  Chavez accepted Kelley's letter of resignation on December 3, 2001, to be effective on January 1, 2002.  <u>See</u> Kelley Depo. at 45:23 - 46:2; Acceptance of Letter of Resignation by Martin J. Chavez to Judy K. Kelley at 1 (December 3, 2001).  White testified that he informed Kelley of the decision to accept her letter of resignation.  <u>See</u> White Depo. at 23:21 - 24:1.

Kelley alleges that her submission of the letter of resignation was not voluntary.  <u>See</u> Kelley Decl. ¶ 3, at 1 .  The letter specifically stated that she did not want Chavez to accept the resignation. <u>See id.</u>; Letter of Resignation at 1.  Chavez admits that Kelley did not want to be let go.  <u>See</u> Chavez Depo. at 71:23 - 72:4.

The Defendants contend that, when Chavez took office, he wanted to change the city attorney's office because he was not pleased with its performance.  <u>See</u> Chavez Depo. at 25:1-5; <u>id.</u> at 28:11-15.  Chavez alleges that he decided to accept Kelley's letter of resignation as part of his effort to "shake up the office."  Chavez Depo. at 25:1-5.  As Chavez explained:

> [CHAVEZ]: I have a distinct impression of Ms. Kelley that she's . . . ["]pedestrian["] as an attorney.
>
> Q: What do you mean by that?
>
> A: Not particularly creative, not particularly outstanding as a lawyer.  One of the concerns I had with the . . . City Attorney's office was that there was dead wood, or an environment where lawyers weren't working the way they were supposed to work; they were were[n't] working as hard as they are supposed to work.

<u>See id.</u> at 28:6-16.  When asked on what Chavez based his opinion that Kelley was not outstanding as an attorney, Chavez could not provide any specific cases or reasons for that opinion.  <u>See id.</u> at

32:23 - 33:2.  Chavez admits that he did not review Kelley's personnel file before terminating her employment.  See id. at 63:6-9.

When asked if Chavez' contact with Kelley during the EEO mediation sessions resulted in his decision to terminate Kelley, Chavez responded that it was not the precipitating reason, but "[i]t was certainly one part of a whole host of things that formed my opinion of Ms. Kelley."  Id. at 53:8-11. Chavez testified, however, that he believed Kelley comported herself in an unprofessional and unethical manner during the EEO mediation sessions.  See id. at 53:12-16.  Chavez contends that Kelley did not comport herself in keeping with his view of a public attorney. See id. at 37:11-20.  In explaining this, Chavez testified that, based on his interactions with Kelley when representing Chacon, he perceived Kelley to be "completely recalcitrant.  It was a stonewall type of practice that I think is certainly acceptable, whether it was ideal in the private sector[] I don't know, but if it's acceptable, I have a different view of how public attorneys are supposed to comport themselves."  Id.  Chavez further explained that, in his view, the public attorneys' "obligation is to do justice," as opposed to private-sector employees' "ultimate interest is just to prevail for your client."  Id. at 37:24 - 38:4. Noting that a city attorney's roles is more akin to a public attorney, Chavez testified that Kelley was more interested in prevailing than accomplishing what is "fair."  Id. at 38:4-8.

Kelley, however, disputes this proffered reason.  See Kelley Decl. ¶ 15, 4.  Instead, Kelley alleges that Chavez accepted her letter of resignation because she did not accept the proposed settlement during the EEO mediation in the Chacon matter.  See Kelley Dec. Add. Facts ¶ 15, at 9-10.  To support this contention, Kelley relies on an affidavit by Denise Sarhan, who is the firm administrator for the Jaffe Law Firm.  See Affidavit of Denise C. Sarhan's Affidavit ¶ 1, at 1 (executed January 27, 2004)(hereinafter "Sarhan's Aff.").  Sarhan spoke with White by phone to

obtain a job reference for Kelley's application to the Jaffe Law Firm. See id. at ¶¶ 3-4, at 1. When asked why Kelley left the City Attorney office, White told Sarhan he thought it was because of "a personality conflict with [Chavez]." Id. When Sarhan inquired further into the nature of the conflict between Kelley and Chavez, White told her that "Kelley had shown up [Chavez] on a particular issue and [Chavez] did not like that." When asked about this conversation in his deposition, White did not recall this particular conversation, but testified he "may have" told a prospective employer that Kelley left the city attorney's office because of a "personality conflict" with Chavez. White Depo. at 35:15 - 36:22.

Kelley also alleges that Chavez' proffered reason for terminating her based on the alleged morale problem in the office is pretext because the transition report compiled for Chavez about the legal department does not mention a morale problem. See Report of Transition Team for City Attorney's Office at 1-2 (dated November 16, 2001); Kelley Decl. ¶ 14, at 4. Moreover, in their depositions, neither White nor Chavez attributed low morale to Kelley. See Chavez Depo. at 27:25 - 28:2 ("The morale in the City Attorney's Office, I thought was very low. Not all necessarily attributable to her."); Kelley Decl. ¶ 14, at 4. White stated that he had no opinion whether there was low morale in the City Attorney's office. See White Depo. at 47:16-20; Kelley Decl. ¶ 14, at 4.

In addition, Kelley alleges that White made comments to her in the fall of 2001 -- before the mayoral election -- that made it clear her job was in jeopardy if the voters elected Chavez. See Kelley Decl. ¶¶ 15, 18, at 4, 11. Kelley understood that, at least in part because her job was in jeopardy, White and CAO Lawrence Rael helped her transfer out of the City Attorney's office into the EEO Officer in the Human Resources ("HR") department. See id. Kelley alleges that, although the letter accepting her resignation was dated December 3, 2001, it was not delivered to her until December

-14-

20, 2001.  <u>See</u> Kelley Decl. ¶ 3, at 1; Kelley Decl. Add. Facts ¶ 3, at 6.  Kelley contends that White

led her to believe that, during this time in December, he was trying to make arrangements with Jay

Czar, former aviation department director, and Irene Garcia, Chavez' newly appointed CAO who had

held a variety of high level positions in prior administrations and who was Chavez' newly appointed

Chief Financial Officer.  <u>See</u> Kelley Decl. Add. Facts ¶ 3, at 7.

Before the mayor accepted her resignation, Kelley began a transfer to the HR department to

another unclassified position.  <u>See</u> White Depo. at 12:4-19.  The Defendants contend that the transfer

was never completed.  <u>See</u> Defendant's Motion for Summary Judgment ¶ 37, at 8; White Depo. at

12:4-9.  Kelley, however, contends that the transfer to the HR department as an EEO officer was

complete before Chavez took office on December 1, 2001.  <u>See</u> Administrative Transfer Letter by

Lawrence Rael to Judy K. Kelley at 1 (dated October 10, 2001)(hereinafter "Transfer Letter"); Kelley

Decl. ¶ 2, at 1; Kelley Decl. Add. Facts ¶ 12, at 10.  Kelley has papers signed by Lawrence Rael, the

CAO, completing her transfer to the HR department effective October 20, 2001.  <u>See</u> Transfer Letter

at 1; Kelley Decl. ¶ 18, at 5.  By the time Chavez accepted her resignation, Kelley had physically

moved out of her office in the Legal Department and was reporting to the HR director.  <u>See</u> Kelley

Decl. ¶ 18, at 5; Kelley Decl. Add. Facts ¶ 12, at 9.  Moreover, Kelley met with members of the HR

Transition team, not the Legal Department team, and attended the HR department staff meetings.

<u>See</u> Kelley Decl. ¶ 18, at 5.  Kelley alleges that, in the HR department, she performed essentially the

same duties as the position of Program Manager (Employee Equity), which was a classified position.

<u>See</u> Kelley Decl. Add. Facts ¶ 12, at 9; Program Manager (Employee Equity) Classification and

Compensation at 1-2 (dated June, 1994).

Upon termination, Kelley had been a City employee for sixteen-and-a-half years.  <u>See</u> Kelley

Decl. Add. Facts ¶ 13, at 9.  Kelley maintains that she reasonably believed that her employment would

continue.  See id.  Kelley filed her EEOC Charge of Discrimination on May 23, 2002.  See First

Amended Complaint ¶ 6, at 2.

## IV.   RACE AND DISCRIMINATION CLAIMS.

In her First Amended Complaint, Kelley alleges that she "was the only white female forced

to resign her position."  First Amended Complaint ¶ 19, at 4.  In her Response, however, Kelley

contends that Chavez accepted the resignations of two Caucasian female attorneys in the City

Attorney's office and no male attorneys.  See Kelley Decl. Add. Facts ¶ 19, at 12.  In support of this

allegation, Kelley cites Chavez' and White's deposition.  See Chavez Depo. at 8:3-18; White Depo.

at 46:12-20; id. at 47:3-6.  This testimony supports the allegation that Chavez accepted the

resignation of Kelley, a Caucasian female, and Hardwick, a Hispanic female, in December, 2001.  See

id.;[1] Affidavit of Cameron Hull ¶ 3, at 1 (stating Ethnic Codes prepared in the list of unclassified

employees refers to Hispanic/Spanish persons with an "S")(executed Jan. 30, 2004); Hull's List of

Unclassified Employees Since 2001 at 2 (listing Hardwick with an "ethnic code" of "S," indicating

she is Hispanic).   The only information in the record about the third woman is a reference to Karen

Weaver in White's testimony.  White testified that Karen Weaver, a Caucasian female, left the

department as well.  See White Depo. at 46:12-22.  According to the list of employees that Hull

compiled, Weaver's termination date was August 9, 2002.  See Hull's List of Unclassified Employees

Since 2001 at 4.  The parties do not supply any other information surrounding the circumstances of

_____

[1] There is some dispute in the record as to when the letters of resignation of Kelley and
Hardwick were actually accepted.  See Kelley Decl. ¶ 4, at 2 (stating Hardwick's resignation was
accepted on December 3, 2001); Hull's List of Unclassified Employees Since 2001 at 2 (listing
Hardwick's termination date as December 28, 2001).

Weaver's departure.

The EEOC response to request for information describes Kelley's replacement employee as follows: "Assistant City Attorney Randy Autio was promoted to Deputy City Attorney. . . . Mr. Autio has been serving as Acting Deputy City Attorney since Charging Party left the City's employment and that he is appointed Deputy City Attorney effective March 9, 2002." Response to Request for Information at 3. <u>See</u> Chavez Depo. at 8:3-18; White Depo. at 46:12-20; <u>id.</u> at 47:3-6. It is not clear from the record who replaced Hardwick's or Weaver's position. <u>See</u> White Depo. at 47:3-6 (stating he did not recall who replaced Hardwick and Weaver, or whether the replacement employees were male or female).

Kelley alleges that, of the attorneys retained, Chavez did not accept the resignation of a male attorney who was a known alcoholic and who was simply putting his hours in. <u>See</u> Response at ¶ 24, at 12; Chavez Depo. at 30:6-19. In addition, the City had settled, for $25,000, a sexual harassment claim that a woman in the City Attorney's office brought. <u>See</u> White Depo. at 26:25 - 27:17.

Kelley contends that she suffered discrimination because Chavez appointed primarily Hispanics. <u>See</u> <u>id.</u> To support this contention, Kelley prepared a document listing Chavez' appointments by race and gender. <u>See</u> Chavez Appointees by Gender and National Origin/Race at 1; Kelley Depo. at 25:24 - 26:11; <u>id.</u> at 28:4-6. According to Kelley's list of appointees, of the twenty-five appointees, fifteen are Hispanic, as compared to nine Caucasian. <u>See</u> Chavez Appointees by Gender and National Origin/Race at 1. The list reflects that only two Caucasian females were appointed out of twenty-five appointments. <u>See</u> <u>id.</u>

Chavez criticizes Kelley's list of appointees, stating it is incomplete. <u>See</u> Chavez Depo. at 14:23 - 15:1. As an example, Chavez notes that he appointed Christine Ching, a female Asian-

American, as Senior Administrative Assistant in the Mayor's Office, but Ching's name does not appear on Kelley's list of appointees. See Chavez Depo. at 16:24 - 17:8; Hull's List of Unclassified Employees Since 2001 at 1; Chavez Appointees by Gender and National Origin/Race at 1. Chavez also testified that he replaced Brude Rizzeri, a Caucasian[2] male, who is listed on Kelley's list as an acting director, with Peter Behrman, a Caucasian, approximately six months after Chavez assumed office. See Chavez Depo. at 18:18-25. Chavez replaced Employee Relations Officer Joseph Chavez, an Hispanic male, with Barbara Kaiser, a female.[3] See id. at 19:12-18. Since his present term began, the Defendants allege that the City has hired eight Caucasian female attorneys. See Hull's List of Unclassified Employees Since 2001 at 1.

Chavez contends that he also replaced the City's former Chief Financial Officer, Irene Garcia, a female Hispanic, with Gail Reese, who is a Caucasian female. See Chavez Depo. at 15:1-12; Hull's List of Unclassified Employees Since 2001 at 2-3. Moreover, Chavez appointed James Lewis, an African-American male, as Chief Operating Officer. See Chavez Depo. at 16:8-12.[4] The Defendants contend that Chavez appointed Teri Baird to the mayor's office as chief of staff; Baird is a female Caucasian. See Chavez Depo. at 16:22-24; Hull's List of Unclassified Employees Since 2001 at 1

---

[2] The parties use the term "Anglo" and "white" interchangeably with "Caucasian." For example, Chavez testified that Behrman is Anglo. For purposes of consistency, the Court describes Behrman as Caucasian.

[3] Chavez did not know the ethnicity of Kaiser, but testified it is "not a minority designation." Chavez Depo. at 19:16-18.

[4] The Court notes that, in the list that Hull prepared, "James A. Lewis," a deputy CAO, is listed as Caucasian. Hull's List of Unclassified Employees Since 2001 at 2. Neither party mentioned the discrepancy between Chavez' testimony that "James Lewis," Chief Operating Officer, is African American and the list stating "James A. Lewis" is Caucasian, or whether the two sources reference different people.

(referring to "Teresa A. Baird").  Kelley disputes this categorization of Baird's race, alleging that the City's data in Hull's affidavit is untrustworthy and inaccurate in several respects.  See Kelley Decl. ¶ 16, at 4.  To support her contention that Hull's list is inaccurate, Kelley points out that Chavez, in his deposition, states that Teri Baird is Hispanic.  See id.; Chavez Depo. at 16:21-23.

Kelley believes she also suffered discrimination on the basis of sex because, according to Kelley, it is "common knowledge in the legal community that Defendant Chavez does not like women and that Defendant White favors men."  Id. at 24:23 - 25:23.

Kelley filed her EEOC Charge of Discrimination on May 23, 2002.  See First Amended Complaint ¶ 6, at 2.

## PROCEDURAL BACKGROUND

Kelley alleges that her dismissal was in retaliation for her participation in an EEO proceeding -- two EEOC mediations -- in which she represented the City against Chavez' client while Chavez was engaged in private practice as an attorney.  Kelley alleges that Chavez fired her as soon as the City of Albuquerque elected him mayor because of her participation in the mediations.

Kelley originally filed her complaint in the Second Judicial District, County of Bernalillo, State of New Mexico, No. CV-2003 01862, on March 14, 2003.  The Defendants removed the case to the United States District Court for the District of New Mexico on April 30, 2003.  See Verified Petition for Removal, filed on Apr. 30, 2003 (Doc. 1).

Kelley contends that her termination violated the New Mexico Human Rights Act ("NMHRA"), N.M.S.A. 1978 § 28-1-1, Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as

amended, 42 U.S.C. §§ 2000e-5(f) to 2000e-17,[5] and her right to equal protection under 42 U.S.C.

§§ 1983 and 1985(2) and (3).

In Count I, Kelley alleges discrimination and retaliation under Title VII and under NMHRA. Specifically, she alleges that she was terminated on account of her sex and her race, as well as in retaliation for the June/July 2000 mediation.  In Count I, Kelley only sued the City, and not Chavez or White.  See First Amended Complaint at 5; Transcript of Hearing at 41:10-13.[6]

In regard to her retaliation claim, Kelley alleges that her termination "was related to her participation in an EEOC proceeding and refusing to settle the matter for the amounts demanded by Defendant Chavez.  This angered Chavez who[,] when in power as Mayor of the City[,] forced [Kelley's] resignation and/or termination of employment."  First Amended Complaint ¶ 29, at 5. Further, Kelley alleges that "Defendant White conspired with Defendant Chavez on behalf of Defendant City of Albuquerque . . . to interfere with [Kelley's] civil rights by impeding, hindering, obstructing, or defeating, in any manner . . . with intent to deny to [Kelley] the equal protection of the laws, or to injure [Kelley] for lawfully enforcing . . . the right of a person to the equal protection of the laws."  First Amended Complaint ¶ 31, at 6.

In Count II, Kelley alleges that White and Chavez conspired to interfere with her civil rights

---

[5]  In her First Amended Complaint, Kelley alleges violation of "42 U.S.C. § 20005e-5(f) *et seq*."  First Amended Complaint ¶ 1, at 1.  The Court assumes that Kelley intended to allege a claim under § 42 U.S.C. § 2000e-5(f).  Kelley then refers to other sections by using the term "*et seq*."  This indicates "[a]nd those . . . sections . . . that follow."  Black's Law Dictionary 574 (7th ed. 1999). Kelley, therefore, only pled to 42 U.S.C. §§ 2000e-5 to 2000e-17 in paragraph 1 of her First Amended Complaint.  Kelley did, however, allege violations of 42 U.S.C. § 2000e-2 and 42 U.S.C. § 2000e-3 in other parts of her complaint.  See First Amended Complaint ¶ 21, at 4.  The Court will assume, therefore, that Kelley has pled to violations of these Title VII sections as well.

[6] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

-20-

under 42 U.S.C. § 1983 and § 1985.  It is unclear whether the Complaint alleges an equal protection claim separate from the claims of conspiracy.  In Count II, Kelley sued the City as well as Chavez and White.

The Defendants, pursuant to rule 56 of the Federal Rules of Civil Procedure, seek dismissal of all claims presented.

## STANDARDS FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  See Celotex v. Catrett, 477 U.S. 317, 322 (1986).  The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party.  See id. at 248. Mere assertions or conjecture as to factual disputes are not enough to survive summary judgment. See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).

## LAW ON QUALIFIED IMMUNITY

Qualified  immunity gives government officials engaged in discretionary activities immunity from suit unless their conduct violates clearly established statutory or constitutional rights.  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The court should ordinarily resolve the availability of the defense at the earliest opportunity to avoid unnecessary cost and excessive interference with government operations.  See id.

Courts analyze the defense of qualified immunity under a two-part framework.  First, the court determines whether the plaintiff has asserted a violation of a statutory or constitutional right; the court then assesses whether that right was clearly established such that a reasonable person in the defendant's position would have known that his conduct violated that right.  See Siegert v. Gilley, 500 U.S. 226, 231-32 (1991);  Liebson v. New Mexico Corrections Dept., 73 F.3d 274, 276 (10th Cir. 1996).  If the plaintiff meets this two-part burden, the defendant "assumes the normal summary judgment burden of establishing that no material facts that would defeat his claim for qualified immunity remain in dispute."  Woodward v. City of Worland, 977 F.2d 1392, 1396-97 (10th Cir. 1992).

The United States Court of Appeals for the Tenth Circuit has set forth the following framework for analyzing the application of the qualified immunity defense to claims brought pursuant to 42 U.S.C. § 1983:

> In analyzing qualified immunity claims, we first ask if a plaintiff has asserted the violation of a constitutional right at all, and then assess whether that right was clearly established at the time of a defendant's actions.  See Siegert v. Gilley, 500 U.S. 226, 232 . . . (1991).  Once a public official raises a qualified immunity defense, the plaintiff bears the burden of (1) coming forward with sufficient facts to show that the defendant's conduct violated the law; and (2) demonstrating that the relevant law was clearly established when the alleged violation occurred.

Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 646 (10th Cir. 1988).  See Lawmaster v. Ward, 125 F.3d 1241, 1346-47 (10th Cir. 1997).

If the defendant's conduct, as alleged by the plaintiff, does not violate the law, the court need not reach the issue whether the law was clearly established.  See Hinton v. City of Elwood, Kan., 997 F.2d 774, 782 (10th Cir. 1993).  If, however, the court is persuaded that the defendant's conduct violated the law, "the plaintiff must [also] show the right the defendant's conduct violated was clearly

established such that a reasonable person in the defendant's position would have known the conduct

violated the right." Garamone v. Romo, 94 F.3d 1446, 1449 (10th Cir. 1996). "While the plaintiff

need not show that the specific action at issue has previously been held unlawful, the alleged

unlawfulness must be 'apparent' in light of preexisting law." Medina v. City and County of Denver,

960 F.2d 1493, 1497 (10th Cir. 1992).

### A.    FIRST PRONG: VIOLATION OF A CONSTITUTIONAL RIGHT.

The first step in the qualified immunity analysis is whether the plaintiff has established a

constitutional violation. The plaintiff "must articulate the clearly established constitutional right . .

. with specificity." Romero v. Fay, 45 F.3d 1472, 1475 (10th Cir. 1995). It is insufficient to "identify

in the abstract a clearly established right and allege that the defendant has violated it." Id. When that

inquiry involves analysis of a subjective intent element, the court must make an inquiry into the

objective reasonableness of the defendant's action. See McCook v. Springer School District, 44 Fed.

Appx. 896, 905 (10th Cir. 2002).  If the defendant meets his burden of showing objective

reasonableness, the court then considers whether the plaintiff has presented evidence of subjective

intent. See id.[7]

---

[7] In Gehl Group v. Koby, 63 F.3d 1528 (10th Cir. 1995), the Tenth Circuit indicated that once the defendant meets its burden, "the Plaintiff's burden to establish subjective motivating animus becomes heightened, requiring specific and concrete evidence rather than mere speculation. Id. at 1535. In Patel v. Wooten, 15 Fed. Appx. 647 (10th Cir. 2001), the Tenth Circuit overruled the heightened pleading requirement. See McCook v. Springer School District, 44 Fed. Appx. at 906 n.5 (recognizing overruling). Although the Tenth Circuit has overruled the heightened pleading requirement, a plaintiff must still meet the general summary judgment standards in order to overcome a defendant's motion for summary judgment on the basis of qualified immunity. That is, a plaintiff must do more than rest on its own speculation or pleadings. See Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)("In a response to a motion for summary judgment, a party cannot rest on ignorance of the facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.").

###### B.     SECOND PRONG: CLEARLY ESTABLISHED LAW.

In pointing to the "clearly established law," the plaintiff must do more than generally allege that a constitutional or statutory provision exists.  See Siegert v. Gilley, 500 U.S. at 232-33.  The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Woodward v. City of Worland, 977 F.2d 1392, 1398 (10th Cir. 1992).  For the law to be clearly established, a Supreme Court of the United States or United States Court of Appeals for the Tenth Circuit decision must be on point, or the clearly established weight of authority from other courts must be as the plaintiff maintains.  See Murrell v. School District No. 1, 186 F.3d 1238, 1251 (10th Cir. 1999)(quoting Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992)).  The applicable test is whether a reasonable official would have known the conduct was unlawful in light of information available at the time.  See Anderson v. Creighton, 483 U.S. 635, 640  (1987).

## LAW REGARDING EQUAL PROTECTION

### I.     SECTION 1983.

"The equal protection clause is triggered when the government treats someone differently than another who is similarly situated."  Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth., 933 F.2d 853, 859 (10th Cir. 1991)(citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).  "The equal protection clause protects not only against discrimination where victims within an identified classification or group are injured, but also where the plaintiff alleges 'an element of intentional or purposeful discrimination' so as to invoke the clause to protect an individual claim."  Smith v. E. N.M. Med. Ctr., No. 94-2213 & 94-2241, 1995 WL 749712, at **7 (10th Cir. Dec. 19, 1995)(unpublished decision)(quoting Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth.,

933 F.2d at 859).

Kelley alleges that the Defendants violated the equal protection clause of the Fourteenth Amendment under a "class of one theory."[8]  The Supreme Court of the United States has recognized that the equal protection clause of the Fourteenth Amendment applies to claims brought by a class of one where the plaintiff alleges that the state has intentionally treated he or she differently from others similarly situated and where there is no rational basis for the difference in treatment.  See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)(per curiam).  Courts, however, have upheld class of one cases in which a governmental body -- although it treated identically situated individuals differently -- the different treatment was rationally related to the government's mission. See Ind. State Teachers Ass'n v. Board of School Comm'rs of the City of Indianapolis, 101 F. 3d 1179, 1181 (7th Cir. 1996)(citing Rubinovitz v. Rogato, 60 F. 3d 906, 911-12 (1st Cir. 1995); Zeigler v. Jackson, 638 F. 2d 776, 779 (5th Cir. 1981); and LeClair v. Saunders, 627 F. 2d 606, 609-10 (2d Cir. 1980)).  While the principal target of the equal protection clause is discrimination against members of vulnerable groups, the clause protects class-of-one plaintiffs victimized by a wholly arbitrary act.  See Ind. State Teachers Ass'n v. Bd. of Sch. Comm'rs of the City of Indianapolis, 101 F. 3d at 1181 (quoting City of New Orleans v. Dukes, 427 U.S. 297, 304 (1976)(per curiam)).

To show a constitutional violation under the "class of one" theory, therefore, the plaintiff must establish two elements: (i) that the Defendants acted with discriminatory intent;[9] and (ii) that the

---

[8] At the hearing on the Motion to Dismiss, Kelley conceded that she is only alleging a violation of the equal protection clause based on the "class of one" theory.  See Transcript at 35:3-5. Because Kelley is not alleging any other theory, such as discrimination based on a protected class, the Court will only discuss the law pertaining to class of one equal protection claims.

[9] Because Kelley alleges a class of one equal protection violation, the Court will apply the modified qualified immunity test.

Defendants treated the plaintiff differently from others who were similarly situated without a rational basis for doing so. See Bartell v. Aurora Public Schools, 263 F.3d 1143, 1149 (10th Cir. 2001).  To establish discriminatory intent, Kelley must show that the Defendants' action "was a spiteful effort to get [Kelley] for reasons wholly unrelated to any legitimate state objective." Id.

In regard to the liability of parties for § 1983 violations, "[p]ersonal participation is an essential allegation in a § 1983 claim." See Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996)(quoting  Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir.1976)).

## II.   CONSPIRACY.

To state a valid conspiracy claim under § 1983, "a plaintiff must allege specific facts showing an agreement and concerted action against the defendants. . . . Conclusory allegations of conspiracy are insufficient to state a valid § 1983 conspiracy claim." See, e.g., Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 533 (10th Cir. 1998)(quoting Hunt v. Bennett, 17 F.3d 1263, 1266 (10th Cir. 1994))(internal citations and quotations omitted).

"The essential elements of a § 1985(3) claim are: (1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993)(citing Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971)).

"[I]n the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under 1985." Bisbee v. Bey, 39 F.3d 1096, 1102 (10th Cir. 1994)(quoting Campbell v. Amax Coal Co., 610 F.2d 701, 702 (10th Cir. 1979)(per curiam))(emphasis in the original).  With respect to the discriminatory motive, the plaintiff must establish that a class-based or racially discriminatory motive lurks behind the conspiratorial activities. See Tilton v. Richardson, 6

-26-

F.3d at 686 ("[Section] 1985(3) does not 'apply to all tortious, conspiratorial interferences with the rights of others,' but rather, only to conspiracies motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.")(quoting <u>Griffin v. Breckenridge</u>, 403 U.S. at 101-02).

## III.   OFFICIAL CAPACITY CLAIMS.

In so far as Kelley sued the City and individuals in their official capacities, she cannot predicate liability on respondeat superior.  Rather, to establish liability, Kelley must show (i) that a constitutional violation occurred; and (ii) that a city policy was the moving force behind the violation. <u>See</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989); <u>Myers v. Oklahoma County Bd. of County Comm'rs</u>, 151 F.3d 1313, 1320 (10th Cir. 1998).  When the highest authority for the municipality makes the decision, that is evidence enough of a policy.  <u>See</u> <u>Randle v. City of Aurora</u>, 69 F.3d 441, 447 (10th Cir. 1995).  As the Tenth Circuit has explained:

> In <u>Pembaur v. City of Cincinnati</u>, the Supreme Court held that the search of a doctor's office without a warrant gave rise to municipal liability because the County Prosecutor was acting as a "final decisionmaker" when he ordered the illegal search. 475 U.S. 469, 484-85 . . . (1986).  Justice Brennan explained that if an official, who possesses final policymaking authority in a certain area, makes a decision--even if it is specific to a particular situation--that decision constitutes municipal policy for § 1983 purposes.  <u>Id.</u> at 481 . . . .  Hence, such an act can be understood as an act "of the municipality" which the municipality "officially sanctioned or ordered."  <u>Id.</u> at 480.

<u>Randle v. City of Aurora</u>, 69 F.3d at 447.  The Tenth Circuit then noted that <u>Pembaur v. City of Cincinnati</u> left open the question of who constitutes a "final policymaker" for the purposes of § 1983 liability.  <u>See</u> <u>Randle v. City of Aurora</u>, 69 F.3d at 447.  After discussing a Supreme Court case addressing this issue,  <u>St. Louis v. Praprotnik</u>, 485 U.S. 112 (1988), the Tenth Circuit concluded:

> Guided by the general principles outlined above, we can identify three elements that

help determine whether an individual is a "final policymaker": (1) whether the official is meaningfully constrained "by policies not of that official's own making;" (2) whether the official's decision are final--i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority. [St. Louis v.] Praprotnik, 485 U.S. at 127 . . . ; Ware v. Unified Sch[.] Dist., 902 F.2d 815, 818 (10th Cir.1990)("Delegation does not occur when a subordinate's decisions are constrained by policies not of his making or when those decisions are subject to review by the authorized policymaker.").

Randle v. City of Aurora, 69 F.3d at 448.

## LAW ON TITLE VII

## I.     DEFINITION OF AN "EMPLOYEE" UNDER TITLE VII.

"In order to prove that the defendants unlawfully retaliated against him in violation of [Title VII] . . . the plaintiff must show, inter alia, that he was an 'employee' within the meaning of [Title VII]." Owens v. Rush, 654 F.2d 1370, 1374 (10th Cir. 1981).  Title VII of the Civil Rights Act of 1964 provides that:

The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policymaking level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.  The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision . . . .

42 U.S.C. § 2000e(f).

Section 2000e(f)'s legislative history reveals that Congress intended the so-called "personal staff" exemption to be narrowly construed.  See Anderson v. City of Albuquerque, 690 F.2d 796, 800 (10th Cir. 1982)(citing Joint Explanatory Statement of Managers at the Conference on H.R. 1746, 92nd Cong.2d Sess., reprinted in 1972 U.S.C. Cong. & Ad. News 2179, 2180).  Congress did not

-28-

exempt employees subject to State or local civil service laws.  See id.  Congress intended the exemption "to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official."  Owens v. Rush, 654 F.2d 1370, 1375 (10th Cir. 1981).

In Anderson v. City of Albuquerque, the City argued that its Human Rights Director came within this exemption.  In denying this argument, the Tenth Circuit reasoned:

> The legislative history of this section states that Congress intended the exemption to be narrowly construed.  Joint Explanatory Statement of Managers at the Conference on H.R. 1746, 92nd Cong.2d Sess., reprinted in 1972 U.S. Code Cong. & Ad. News 2179, 2180.  The exemption does not apply unless the facts clearly establish that the person is: (1) an elected public official; or (2) chosen by an elected official to be on his personal staff; or (3) appointed by an elected official to a policymaking position; or (4) an immediate advisor to an elected official regarding the exercise of the constitutional or legal powers of the elected office.  Id.; Gearhart v. Oregon, 410 F.Supp. 597, 600 (D. Ore.1976).

> The district court based its conclusion upon findings that the mayor has unlimited discretion to make the appointment, the position is not covered by city or state civil service provisions, and the "position involves, at least to some degree, advice to the Office of the Mayor with respect to the legal powers of the Mayor pertaining to the relevant human rights ordinances and/or the Human Rights Act."  Rec., vol. I, at 203.  The City contends that the staff director of the Human Rights Board is either an appointee at a policymaking level, or an immediate advisor with respect to the constitutional and legal powers of an elected official within the meaning of the exemption.

> The staff director serves under the direction of the City's Chief Administrative Officer (CAO) and the members of the Human Rights Board.  All of these individuals are themselves appointees . . . .

> Also, there is considerable question whether the staff director is chosen by the mayor.  The Albuquerque Human Rights Ordinance, which created the Human Rights Board, provides that the CAO, an official who is appointed by the mayor, shall "(e)mploy, after consultation with the Human Rights Board, a staff director, and hire or cause to be hired such other employees for the Board as he/she may deem necessary."  Rec., vol. X, Pl.Ex. 1.  Indeed, the mayor's actual participation in the appointment at issue here was virtually nonexistent.  The applicants were originally screened by an assistant

to the CAO.  They were then interviewed by the Human Rights Board and the names of the leading candidates were recommended to the CAO.  The mayor did not establish criteria, review resumes, or interview applicants.  The actual selection was made by the CAO who subsequently sought the mayor's concurrence "just to make sure that the mayor saw in the selection the kind of compatibility that any mayor would be looking for in his administration."  Rec., vol. IV, at 194.  While the mayor testified that as Chief Executive Officer of the City he is the final decision maker, he is not the official directly charged with appointing the staff director of the Human Rights Board. Based on this record, we do not believe that the staff director was in fact appointed by an elected official within the meaning of section 2000e(f).

Application of the exemption cannot be supported by the trial court's finding that the staff director has occasionally advised the mayor on his constitutional and legal powers. The staff director is not required to have a law degree, and is not attached to the City's legal office.  Although the previous staff director was an attorney who occasionally gave the mayor unofficial legal advice, the director chosen to replace him does not have a law degree.  In general, the staff director deals primarily with other appointees who are themselves advisors to the mayor.  Direct interaction between the mayor and the staff director is minimal.

In any event, the position does not fit into the narrow exemption intended by Congress.  Although the staff director is not subject to all the rights and guarantees of the City's merit system, that fact without more does not make the position exempt. See Owens v. Rush, 654 F.2d 1370, 1375 (10th Cir. 1981); Howard v. Ward County, 418 F.Supp. 494, 502 (D.N. Dak.1976).  The exclusion from coverage was intended "to exempt ... those who are chosen by the Governor or the mayor . . . , whatever the elected official is, and who are in a close personal relationship and an immediate relationship with him. Those who are his first line of advisors."  118 Cong.Rec. 4492-93 (1972); see also Owens [v. Rush], 654 F.2d at 1375; Gearhart [v. Oregon], 410 F.Supp. at 601.  The nature and circumstances of the employment relationship between the staff director and the mayor do not demonstrate the intimate and sensitive association contemplated by the legislators who framed the exemption.  See id.

In sum, considering the facts of this case and construing the exemption narrowly, we conclude that the staff director does not formulate policy or advise the mayor so as to create the immediate and personal relationship required by the exception. Accordingly, we hold that the exemption provided by section 2000e(f) does not apply to the position at issue here.

690 F.2d at 800-01.  In Anderson v. City of Albuquerque, therefore, the Tenth Circuit held that a

staff director without a law degree is an "employee" under Title VII.  See id.

In <u>Owens v. Rush</u>, 654 F.2d 1370 (10th Cir. 1981), however, the Tenth Circuit concluded that an undersheriff is not an "employee" under Title VII because the position falls within the "personal staff exception of [§] 2000e(f)." <u>Id.</u> at 1376-77.   In <u>Owens v. Rush</u>, a husband and wife alleged, among other things, unlawful retaliation under Title VII by the county sheriff.  The sheriff appointed the husband as his "undersheriff," the second in command of the Sheriff's Department.  The sheriff appointed the wife a deputy sheriff, and assigned her various clerical duties.   The United States District Court for the District of Kansas held that the wife, as a deputy sheriff, is an "employee" for the purposes of Title VI, but that her husband, the undersheriff, was not an "employee" because of the personal staff exemption under § 2000e(f).  <u>See</u> <u>Owens v. Rush</u>, No. 76-32-C5, 1978 WL 13860 (D. Kan. April 5, 1978)(page numbers unavailable).  In so holding, the district court reasoned that the husband had a "very close working relationship" with the sheriff.  <u>Id.</u>  As the second in command, the husband fell within § 2000e(f)'s personal staff exemption.   The district court, however, distinguished the character of the wife's position, noting that, although the sheriff personally appointed her, her duties were mainly clerical in nature.  The district court concluded that, unlike her husband, the wife's position as a deputy sheriff is an employee within § 2000e(f).  The husband appealed, arguing that, as undersheriff, he was an employee for Title VII purposes.[10]

In <u>Rabouin v. Colo. Dept. of Law</u>, 754 F.Supp. 171 (D. Colo. 1990), the Honorable Lewis T. Babcock, United States District Judge, held that an assistant attorney general was not on the attorney general's personal staff.  As Judge Babcock explained:

---

[10] The wife's remaining Title VII action went to a bench trial, and the district court held that she had not suffered discrimination on the basis of pay.  Although the wife appealed, neither party raised on appeal the earlier holding that she was an employee under Title VII.  The Tenth Circuit, therefore, did not address the district court's holding that a deputy sheriff is an employee under § 2000e(f).

The personal staff exception is narrowly construed.   Anderson v. City of Albuquerque, 690 F.2d 796, 800 (10th Cir. 1982).  It is intended to exempt those who are chosen by an elected official and who are in close, personal, and immediate relationship with the elected official.  Anderson[ v. City of Albuquerque], 690 F.2d at 801; 118 Cong. Rec. 4492-93 (1972).  It applies "only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official."  Owens v. Rush, 654 F.2d 1370, 1375 (10th Cir. 1981); see Starrett v. Wadley, 876 F.2d 808, 821 (10th Cir. 1989).  The inquiry is highly factual and does not lend itself well to resolution by summary judgment.  See  Teneyuca v. Bexar County, 767 F.2d 148, 152 (5th Cir. 1985).

Plaintiff has made a sufficient showing to establish a genuine issue regarding the nature of the relationship between plaintiff and the defendants.  Although plaintiff was appointed by an elected official (Woodard, the former Attorney General), see Colo. Rev. Stat. § 24-31-104, she was of the most junior level of attorneys in the office.  She was several supervisory levels below the Attorney General and had no policymaking authority.  Far from being a first line advisor to the Attorney General, plaintiff was but one of some one-hundred and forty staff attorneys in the office. According to plaintiff's affidavit, she had minimal contact with the Attorney General during employment.  Indeed, plaintiff states that:

> [w]ith the exception of office social functions, my only contacts with Attorney General Woodard were to inform him of the discrimination and other employment-related problems which I was experiencing.  I had no consultation with the Attorney General regarding substantive legal matters or policymaking matters.  I certainly did not have a close and immediate personal relationship with him.   I did not receive assignments directly from Mr. Woodard.

I conclude that plaintiff has established a genuine factual dispute as to whether her position was to "formulate policy or advise [Woodard] so as to create the immediate and personal relationship" required for the "narrow exception intended by Congress." Anderson[ v. City of Albuquerque], 690 F.2d at 801; Starett[ v. Wadley], 876 F.2d at 822.

754 F.Supp. at 174.  On the other hand, courts have held that some attorneys are not employees within the meaning of Title VII's definition.  See Guy v. State of Illinois, 958 F.Supp. 1300, 1305 (N.D. Ill. 1997)(holding that assistant state attorney was on policy-making level of state elected official and thus excluded from Title VII); Lococo v. Barger, 958 F.Supp. 290, 292-93 (E.D. Ky.

1997)(holding that assistant county attorney was personal staff member and therefore not an employee within meaning of employee in Title VII), rev'd in part on other grounds, No. 98-6483, 98-6726, 98-6756, 234 F.3d 1268 (6th Cir. Nov. 2, 2000) (unpublished decision).

The Tenth Circuit has adopted a non-exhaustive list of factors from the Fifth Circuit to consider when evaluating the "personal staff" exception:

> (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

Nichols v. Hurley, 921 F.2d 1101, 1110 (10th Cir. 1990)(quoting Teneyuca v. Bexar County, 767 F.2d 148, 151 (5th Cir. 1985)).

## II.   DISCRIMINATION COMPLAINT FILING REQUIREMENTS.

To properly exhaust administrative remedies, a plaintiff must comply in a timely manner with all applicable deadlines.  See Phillips v. Widnall, 79 F.Supp.2d 1265, 1268 (D.N.M. 1999)(Mechem, J.).  If a plaintiff fails to comply with the applicable deadlines, her claim will be time barred.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002); Davis v. U.S. Postal Serv., 934 F.Supp. 1210, 1213 (D. Colo. 1996)("These time limits are similar to a statute of limitations period. An individual who has failed to comply with the administrative timing requirements is barred from bringing an action in federal court, absent grounds for equitable tolling."), rev'd on other grounds, 142 F.3d 1334 (10th Cir. 1998).

Filing a charge of discrimination within 300 days after the allegedly discriminatory action, therefore, is a prerequisite to a civil suit under Title VII.  See Martin v. Nannie & the Newborns, Inc.,

3 F.3d 1410, 1415 (10th Cir. 1993), <u>overruled in part on other grounds recognized by Davidson v.</u> <u>America Online, Inc.</u>, 337 F.3d 1179, 1183 (10th Cir. 2003).  For discrete discriminatory actions, the clock begins to run on the date the incident occurs.  <u>See Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. at 113.

**LAW REGARDING DISCRIMINATION AND RETALIATION**

## I.    THE MCDONNELL DOUGLAS ANALYSIS.

The plaintiff bears the burden of proving discrimination and retaliation.  She may do so by direct evidence,  or by indirect proof under the analytical framework that the Supreme Court of the United States set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See id.</u> at 802- 04; <u>Morgan v. Hilti Inc.</u>, 108 F.3d 1319, 1323 (10th Cir. 1997).  Where the plaintiff is proceeding under <u>McDonnell Douglas Corp. v. Green</u>, the plaintiff must first set forth a prima facie case of discrimination and retaliation.  <u>See Tex. Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 252- 53 (1981).

If the plaintiff establishes a prima facie case for either claim, the burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its employment related decision.  <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802.  Upon the employer's articulation of legitimate, nondiscriminatory reasons, the presumption of discrimination established by the prima facie case "simply drops out of the picture."  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 510-11 (1993). To withstand summary judgment, a plaintiff must "present[] evidence that the defendant's proferred reason for the employment decision was pretextual-i.e. unworthy of belief."  <u>Kendrick v. Penske</u>

Transp. Services, Inc., 220 F.3d at 1230.[11]   "Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)(quoting Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951-52 (3d Cir. 1996)).  "To avoid summary judgment, a party must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed.  Thus, plaintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."  Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988)(internal citations and quotations omitted)(alteration in the original).

### A.   PRIMA FACIE CASE OF INTENTIONAL DISCRIMINATION.

In the United States Court of Appeals for the Tenth Circuit, a plaintiff must demonstrate four elements to establish a prima facie case of discriminatory discharge: (i) she belongs to a protected class; (ii) she was qualified for his job; (iii) despite her qualifications, she was discharged; and (iv) the job was not eliminated after her discharge.  See Kendrick v. Penske Transp. Services, Inc., 220 F.3d

---

[11] The plaintiff does not -- at the summary judgment stage of the proceedings -- need to show that the actual or real reason for the unlawful action was discriminatory or retaliatory; instead, the plaintiff need only establish that  the defendant's proffered reasons are false or unworthy of belief. If the case progresses to a judgment on the merits, however, "the sequential analytical model adopted from McDonnell Douglas . . . drops out and [the court is] left with the single overarching issue whether the plaintiff adduced sufficient evidence to warrant a jury's determination [of unlawful discrimination]."  Fallis v. Kerr-McGee Corp., 944 F.2d 743, 744 (10th Cir. 1991)(internal citations omitted).

1220, 1229 (citing <u>Perry v. Woodward</u>, 199 F.3d 1126, 1138 (10th Cir.1999)).[12]

## B.    RETALIATION: PRIMA FACIE CASE.

"Title VII forbids retaliation against an employee because she has 'opposed' any practice made unlawful by Title VII, or because she has 'participated . . . in an investigation, proceeding, or hearing under this subchapter.'  42 U.S.C. § 2000e-3(a).  Where there is no direct evidence of retaliation, we analyze a retaliation claim under the <u>McDonnell Douglas</u> burden-shifting framework." <u>Stover v. Martinez</u>, 382 F.3d 1064, 1070 (10th Cir. 2004).

The prima facie case for retaliation requires that the plaintiff establish that: (i) she engaged in protected activity; (ii) she was subjected to an adverse action by defendant subsequent to or contemporaneous with such activity; and (iii) a causal connection between the activity and the adverse action.  <u>See</u> <u>Vigil v. City of Las Cruces</u>, No. 96-2059, 1997 WL 265095, at **4 (10th Cir. May 20, 1997)(unpublished decision)(quoting <u>Berry v. Stevinson Chevrolet</u>, 74 F.3d 980, 985 (10th Cir. 1996)).

### 1.    Protected Activity.

42 U.S.C. § 2000e-3(a) states:

> It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

---

[12] In <u>Kendrick v. Penske Transp. Services, Inc.</u>, the Honorable David M. Ebel, United States Court of Appeals Judge, explained that "the fourth prong [of the McDonnell Douglas analysis] only required the plaintiff to show that his or her job was not eliminated after the discharge.  None of our earlier cases have required that the replacement employee be a member of a nonprotected class as part of the plaintiff's case, nor indeed was any comparison to nonprotected employees required as part of the plaintiff's case."  <u>Id.</u> at 220 F.3d 1227.

Id.  An employee engages in protected activity when he or she files an EEO claim.  See Anderson v. Coors Brewing Co.,181 F.3d 1171, 1178 (10th Cir. 1999).  It is unlawful, therefore, for an employer to terminate an employee based on their participation in the protected activity of filing an EEO charge.  See id.        Title VII does not just protect the person filing the EEO claim; it extends to testifying, assisting or participating in the proceedings arising out of an EEO claim as well.  See 42 U.S.C. § 2000e-3(a).  The parties, however, do not present to the Court -- nor could this Court find -- any case law addressing whether a defense lawyer to a EEO proceeding "participates" in a protected activity.

## 2.    Casual Connection.

The Tenth Circuit recently articulated the plaintiff's burden in establishing the causal connection element of the prima facie case:  "[The] Plaintiff can establish the requisite causal connection by producing 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'"  Adams v. Wash. Univ. of Topeka, No. 02-3071, 2003 WL 21290924, at *821-22 (10th Cir. June 5, 2003)(unpublished decision)(quoting Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982)).  "[U]nless the [adverse action] is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation."  Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999)(emphasis in original).  "A causal connection may be shown by 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001).  If no other evidence supports a causal connection between the protected activity, the Tenth Circuit has held that a one and one-half month period

between protected activity and adverse action may, by itself, establish causation, but a three-month

period, standing alone, is insufficient to establish causation.  See Anderson v. Coors Brewing Co.,

181 F.3d at 1179.

## II.    TITLE VII DISPARATE IMPACT.

"Disparate impact claims involve facially neutral employment practices that have an adversely

different effect on a particular group.  Unlike disparate treatment claims, disparate impact  causes of

action require no findings of intentional discrimination.  To establish a prima facie case of disparate

impact discrimination, plaintiff must prove a specific identifiable employment practice or policy

caused a significant disparate impact on a protected group.  Plaintiff may rely on statistics  to support

his case, but any statistical analysis must involve the appropriate comparables . . . and must cross a

threshold of reliability before it can establish even a prima facie case of disparate impact." Chavez

v. Coors Brewing Co., No. 98-1109, 1999 WL 162606, at **3 (10th Cir. March 25, 1999)(internal

citations and quotations omitted).

### LAW REGARDING NEW MEXICO HUMAN RIGHTS ACT

The definition of employee under Title VII is not the same as under NMHRA, which has no

exemption for "immediate" policymakers as does Title VII.   NMHRA defines an employee as "any

person in the employ of an employer or an applicant for employment."  See N.M.S.A. 1978 § 28-1-

2E.

"Plaintiff's burden of establishing a prima facie case under the New Mexico Human Rights

Act, NMSA § 28-1-7, is actually identical to his burden under Title VII." Gioia v. Pinkerton's

Inc.,194 F.Supp.2d 1207,  1220 (D.N.M. 2002)(Black, J.)(citing Cates v. Regents of the N.M. Inst.

of Mining & Tech., 124 N.M. 633, 954 P.2d 65, 70 (1998); Smith v. FDC Corp., 109 N.M. 514, 517,

-38-

787 P.2d 433, 436 (1990)(adopting "evidentiary methodology" of the <u>McDonnell</u>-<u>Douglas</u> analysis,

but noting that "New Mexico law [is not bound] to interpretations made by the federal courts of the

federal statute."). As with Title VII, unlawful retaliation is an cause of action under NMHRA. <u>See</u>

<u>Ocana v. Am. Furniture Co.</u>, 135 N.M. 539, 91 P.3d 58, 72 (2004)(only Pacific Reporter pagination

available)("NMHRA makes it unlawful for any person or employer to retaliate against 'any person

who has opposed any unlawful discriminatory practice.'")(quoting N.M.S.A. 1978 § 28-1-7(I)(2) and

citing  <u>Gonzales v. N.M. Dep't of Health</u>, 129 N.M. 586, 593-94, 11 P.3d 550,  557-58 (2000)).

Unlike Title VII, however, under which employees are not individually liable,[13] the Supreme Court

of New Mexico "has acknowledged the possibility of individual liability for discrimination claims."

<u>Sonntag v. Shaw</u>, 130 N.M. 238, 243, 22 P.3d 1188, 1193 (2001).  In recognizing that an individual

defendant can be liable under NMHRA, this Court joins the decisions of the Honorable John Edwards

---

[13]  In the Tenth Circuit, employees, including supervisors, are not individually liable under Title VII.  <u>See</u> <u>Haynes v. Williams</u>, 88 F.3d 898,  901 (10th Cir. 1996)("[T]he language and structure of amended Title VII continue to reflect the legislative judgment that statutory liability is appropriately borne by employers, not individual supervisors. . . .  [P]ersonal capacity suits against individual supervisors are inappropriate under Title VII..")(citing <u>Sauers v. Salt Lake County</u>, 1 F.3d 1122, 1125 (10th Cir.1993)); <u>Sauers v. Salt Lake County</u>, 1 F.3d 1122, 1125 (10th Cir.1993)("Under Title VII, suits against individuals must proceed in their official capacity; individual capacity suits are inappropriate").  Although the circuits are split on whether employees can be held individual liable under Title VII, the trend is to disallow individual liability.  <u>See</u> 3 <u>Emp.</u> <u>Discrim.</u> <u>Coord.</u> <u>Analysis</u> of <u>Federal</u> <u>Law</u> § 121:3 (2004).  The Second, Fifth, Ninth, and Eleventh Circuits have also held that an employee may not be liable in their individual capacity under Title VII.  <u>See</u> <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1313 (2d Cir. 1995)(holding "that individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII."), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 753 (1998); <u>Miller v. Maxwell's Int'l Inc.</u>, 991 F.2d 583, 587 (9th Cir.1993)("The liability scheme[] under Title VII . . . limit[s] civil liability to the employer."), <u>cert.</u> <u>denied</u>, 510 U.S. 1109 (1994); <u>Grant v. Lone Star Company</u>, 21 F.3d 649, 653 (5th Cir.), <u>cert.</u> <u>denied</u>, 513 U.S. 1015 (1994)("[T]here is no indication anywhere in title VII that Congress intended to impose individual liability . . . ."); <u>Busby v. City of Orlando</u>, 931 F.2d 764, 772 (11th Cir.1991)(concluding that Title VII "claims must be made against the municipal officer in his official capacity, not in his individual capacity.").

Conway, United States District Judge, see Ross v. Lee Enter., Inc., No. CIV 99-0139, at 3-4, filed

May 28, 1999 (Doc. 39); the Honorable James A. Parker, United States District Judge, see Denham

v. Mesa Mental Health, CIV No. 98-540, at 2, filed Aug. 7, 1998 (Doc. 17); the Honorable Bruce

Black, United States District Judge, see Sieben v. City of Albuquerque, No. CIV 96-1822, at 3, filed

Nov. 21, 1997)(Doc. 88); and the Honorable Judge Richard Puglisi, United States Magistrate Judge,

see Sanchez v. Mora-San Miguel Elec. Coop., No. CIV 96-1430, filed Mar. 24, 1997 (Doc. 24).

Before a plaintiff can state a valid claim against an individual defendant under NMHRA,

however, the plaintiff must first exhaust her administrative remedies.  See id. (quoting Luboyeski v.

Hill, 117 N.M. 380, 382, 872 P.2d 353, 355 (1994)).  NMHRA grievance procedures require that:

> Any person claiming to be aggrieved by an unlawful discriminatory practice . . . may
> file with the human rights division of the labor department a written complaint that
> shall state the name and address of the person alleged to have engaged in the
> discriminatory practice, all information relating to the discriminatory practice and any
> other information that may be required by the commission. All complaints shall be
> filed with the division within one hundred eighty days after the alleged act was
> committed.

N.M.S.A. 1978 § 28-1-10.  As the Supreme Court of New Mexico has held, "individual defendants

cannot be sued in [New Mexico state] district court under the [New Mexico] Human Rights Act

unless and until the complainant exhausts her administrative remedies against them."  Luboyeski v.

Hill, 117 N.M. at 382, 872 P.2d at 355 (holding that "when a defendant is sued *under the Human

Rights Act* the plaintiff must exhaust her or his administrative remedies before brining an action in

district court.")(emphasis in the original).  Compliance with the grievance procedures is a prerequisite

to seeking judicial review.  See id.  ("[C]ompliance with the grievance procedure in the Human Rights

Act is a prerequisite to suit in district court under the Act: 'The comprehensive nature of the Act

supports the conclusion that the legislature intended that the grievance procedure is mandatory when

unlawful discriminatory practices are alleged.'")(citing <u>Jaramillo v. J.C. Penney Co.</u>, 102 N.M. 272, 273, 694 P.2d 528, 529 (Ct. App. 1985)).

<u>ANALYSIS</u>

The Court will grant summary judgment on Kelley's the equal protection clause/conspiracy claim. The Court, however, will deny the Defendants' motion for summary judgment on the Title VII discrimination and retaliation claims.[14]

## I.   THE COURT WILL GRANT SUMMARY JUDGMENT ON KELLEY'S EQUAL PROTECTION/CONSPIRACY CLAIMS.

Although the allegations in Count II are unclear as to the underlying basis for the discrimination claim, at the hearing on the Motion to Dismiss, Kelley conceded that her § 1983 claim is based only upon a "class-of-theory" theory. <u>See</u> Transcript at 35:3-5. Kelley alleges that "her termination was irrational and wholly arbitrary and based upon malignant animosity towards Plaintiff in violation of the equal protection clause of the Fourteenth Amendment." Response at 22.

### A.   THE CLASS-OF-ONE THEORY APPLIES TO THE EMPLOYMENT CONTEXT.

Kelley alleges an equal protection violation based on the class-of-one theory. The Supreme Court recognized class-of-one claims in <u>Village of Willowbrook v. Olech</u>, in which the Court explained that a "successful equal protection class claim[ may be] brought by a 'class-of-one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. 562, 564 (2000). <u>Village of Willowbrook v. Olech</u>, however, addressed the issue in the context of discriminatory zoning practices

---

[14] Because Kelley does not raise or otherwise allege a violation of substantive or procedural due process, the Court will not address the issue of whether Kelley has a property interest in her employment.

-41-

and did not involve an employee-employer relationship.  The Court, therefore, must resolve whether the holding of <u>Village of Willowbrook v. Olech</u> applies to employment cases under current Tenth Circuit law.  At the hearing on this motion, the Court ruled from the bench that, based on the cases before it, it did not believe class-of-one equal protection claims applied in the employment context. Accordingly, it granted the Defendants' motion for summary judgment on the equal protection claims.[15]  Having reviewed additional cases, in particular <u>Bartell v. Aurura Pub. Schs.</u>, 263 F.3d 1143 (10th Cir. 2001), however, the Court holds that -- in the Tenth Circuit -- class-of-one equal protection clause claims apply to the employment context.

In a case decided after the Supreme Court's decision in <u>Village of Willowbrook v. Olech</u>, the Tenth Circuit, in <u>Bartell v. Aurura Pub. Schs.</u>, applied the class-of-one theory to the employment context.  In that case, a former school employee and his wife alleged that his former employer violated his equal protection rights arising from sexual harassment charges brought against him.  <u>See</u> 263 F.3d  at 1144.  The district court granted summary judgment on the equal protection claim, holding that "the Tenth Circuit has not 'recognized an equal protection cause of action for individual victims of selective, purposeful discrimination by government officials who harbor animosity towards the victim.'"  <u>Id.</u> at 1148 (quoting the district court's decision).  The Tenth Circuit reversed, explaining that the class-of-one equal protection theory is a "viable legal theory" in this circuit.  <u>Id.</u> In support of this conclusion, the Tenth Circuit cited to <u>Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth.</u>, a Tenth Circuit decision that applied the class-of-one equal protection theory in the context of a contractor who sued a municipality because the municipality did not award the

---

[15] The Court was familiar with, and relied upon, the Honorable Bruce Black, United States District Court's reasoning and analysis in <u>Weaver v. Chavez</u>, No. CIV-03-0281, Memorandum Opinion and Order at 17-18 (D.N.M., filed Feb. 26, 2004).

contractor a contract, despite being the lowest bidder.  See 933 F.2d at 859.  In Buckley Constr., Inc.
v. Shawnee Civic & Cultural Dev. Auth., the Tenth Circuit held that the contractor "did not single
out any class of contractors, nor has [the plaintiff] alleged 'an element of intentional or purposeful
discrimination' in the application on the bidding procedures so as to invoke the clause as an
individual."  Id. (citing Snowden v. Hughes, 321 U.S. 1, 8 (1944)).  In Bartell v. Aurura Pub. Schs.,
the Tenth Circuit also cited other persuasive, albeit non-binding, cases to support its finding that the
class-of-one theory is a recognized theory in the Tenth Circuit. See Smith v. E. N.M. Med. Ctr., No.
94-2213 & 94-2241, 1995 WL 749712, at **8 (10th Cir. 1995)(unpublished decision); Vanderhurst
v. Colo. Mtn. Coll. Dist., 16 F.Supp.2d 1297, 1300-02 (D. Colo. 1998).  In these two cases, both of
which involved an employee-employer relationship, the courts applied the class-of-one equal
protection theory in their analysis.  See id.  Finally, in reaching its decision, the Tenth Circuit noted
that the Supreme Court, in Village of Willowbrook v. Olech, recognized the class-of-one equal
protection claims and held "that plaintiffs need not allege they were part of a suspect class or
implicate a fundamental right to state a claim under the Equal Protection Clause."  Bartell v. Aurura
Pub. Schs., 263 F.3d at 1149.

Courts from other circuits have reached similar conclusions as to the applicability of the class-
of-one theory in the employment context.  See, e.g., Levenstein v. Salafsky, 164 F.3d 345, 352-53
(7th Cir. 1998); Ciechon v. City of Chicago, 686 F.2d 511, 522-23 (7th Cir. 1982)(applying the class-
of-one theory to a claim brought by a paramedic against the Chicago Fire Department); Glemza v.
Nygren, No. 02 C 50250, 2004 WL 1630499 (N.D. Ill. June 2, 2004)(applying the class-of-one
theory in the employment context, citing Levenstein v. Salafsky for the proposition that: "Prior to the
Supreme Court's approval of the class-of-one approach [in Village of Willowbrook v. Olech], the

Seventh Circuit applied [the class-of-one theory] in the employment context."); Enquist v. Or. Dep't of Agric., No. Civ. 02-1637, 2004 WL 2066748, at *4-5 (D.Or. Sept. 14, 2004)(citing Bartell v. Aurura Pub. Schs., 263 F.3d at 1149, to support its conclusion that the class-of-one theory applies to the employment context).

Other courts, however, have expressed their doubts and concerns about applying the class-of-one theory in the employment context. For example, in Campagna v. Commonwealth of Mass. Dep't of Envtl. Prot., 206 F.Supp.2d 120 (D. Mass. 2002), the District Court for the District of Massachusetts rejected the application of the class-of-one theory in equal protection claims arising in the employment context. As the district court explained:

> While [the class-of-one] theory may have some viability in certain contexts, if supported by adequate allegations, the applicability of the "class-of-one" theory to an employment-based equal protection claim seems dubious. [Village of Willowbrook v.] Olech itself was a discriminatory zoning case, and Justice Breyer in his separate concurrence expressed concern about transforming "run-of-the-mill zoning cases into cases of constitutional right." 528 U.S. at 566 . . . . In this case, if plaintiff is correct on the law, any public employee convinced that someone similarly situated is being treated more favorably could sue his or her employer under the Fourteenth Amendment for a violation of equal protection. Since practically every employee, public or private, is bound to be convinced at some point that he or she is getting the short end of the stick, it is not hard to imagine the bee hive of constitutional litigation that would be generated by this variant of the "class-of-one" doctrine. It seems unlikely that the Supreme Court intended such a dramatic result in its per curiam opinion in [Village of Willowbrook v.] Olech.

Id. at 126-27. The district court then noted that, "it is not necessary to grapple with this cumbersome doctrinal issue, since the complaint has not adequately alleged that plaintiff was 'treated differently from others *similarly situated*.'"  Id. at 127 (citing Village of Willowbrook v. Olech, 528 U.S. at 566)(emphasis in the original).  Similarly, in Cain v. Tigard-Tualatin School Dist. 23J, 262 F.Supp.2d 1120 (D. Or. 2003), the District Court for the District of Oregon expressed reservation about

applying the class-of-one theory in the employment context. See id. at 1137 (quoting Campagna v. Commonwealth of Mass. Dep't of Envtl. Prot., 206 F.Supp.2d at 126-27). Like the court in Campagna v. Commonwealth of Mass. Dep't of Envtl. Prot., however, the District of Oregon court disposed of the equal protection claim on other grounds. See Cain v. Tigard-Tualatin School Dist. 23J, 262 F.Supp.2d at 1137-38 (holding that the plaintiff's equal protection claim failed because the plaintiff did not offer evidence that the Defendant violated any constitutional right). See also Joubran v. McCord, No. 00-72606, 2001 WL 1218340, at *2 (E.D. Mich. Aug. 8, 2001)(unpublished decision)(noting that Village of Willowbrook v. Olech, "and all the cases cited in support of it, involved claims of disparate treatment by property owners under various property and zoning laws" and that neither the court nor the parties located "any [cases] appl[ying] . . . the 'class-of-one' theory outside of the property-owner context," and concluding that "it is unclear whether it is applicable to [§ 1983 claim]").

Like these courts, the Court harbors concerns about applying the class-of-one theory to equal protection claims arising in the employment context. Under current Tenth Circuit law, however, it appears that the class-of-one equal protection clause claim applies in the employment context. The Court, therefore, declines to grant summary judgment on Kelley's equal protection clause claim on this ground.

### B. THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON THE EQUAL PROTECTION CLAIM.

In order to survive the individual Defendant's claim of qualified immunity, Kelley must first establish that the individual Defendants violated her constitutional rights. In particular, Kelley must show two elements to establish a violation of the equal protection clause on a "class-of-one" theory:

(i) that the Defendants acted with discriminatory intent and (ii) that the Defendants treated Kelley differently from others who were similarly situated without a rational basis for doing so.    Applying the class-of-one theory to employment-context equal protection claims, Kelley's equal protection claim fails because she does not offer evidence showing that similarly situated individuals were treated differently than she was.  Because Kelley has not established a violation of the equal protection clause occurred, the individual Defendants are entitled to qualified immunity on the equal protection claim.[16]

    To bring a successful equal protection clause claim based on the class-of-one theory, the plaintiff must allege that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Village of Willowbrook v. Olech, 528 U.S. at 1074.  Kelley, however, does not offer evidence to establish a genuine issue of material fact that she was similarly situated to others and that those similarly situated persons were treated differently.  In an opinion issued before the Supreme Court decided Village of Willowbrook v. Olech, the Honorable Judge Richard A. Posner, United States Circuit Judge, emphasized the importance of only applying the class-of-one theory to equal protection clause claims involving unequal treatment of identical persons.  See Ind. State Teachers Assoc. v. Bd. of Sch. Comm'rs of the City of Indianapolis, 101 F.3d 1179, 1181-82 (7th Cir. 1996)(Posner, J.).  As Judge Posner explained:

> The concept of equal protection is trivialized when it is used to subject every decision made by state or local government to constitutional review by federal courts.  To decide is to choose, and ordinarily to choose between--to choose one suppliant, applicant, petitioner, protester, contractor, or employee over another.  Can the loser in the contest automatically appeal to the federal courts on the ground that the decision was arbitrary and an arbitrary decision treats likes as unlike and therefore

---

[16] Because the Court has concluded that the individual Defendants are entitled to qualified immunity on the equal protection claim based on Kelley not offering evidence of similarly situated individuals,  the Court need not resolve -- for the purposes of deciding qualified immunity on the equal protection claim -- whether the individual Defendants acted with discriminatory intent.

denies the equal protection of the laws?  That would constitutionalize the
Administrative Procedure Act and make its provisions binding on state and local
government and enforceable in the federal courts . . . .

When . . . the government is treating unequally persons who are prima facie identical
in all relevant respects, the equal protection clause can be brought into play as a
protection against allowing the government to single out a hapless individual, firm,
or other entity for unfavorable treatment . . . . But when as in the present case the
government is treating unequally two persons that are prima facie unequal in a
rationally relevant respect . . . the equal protection clause is inapplicable because the
plaintiff is asking for a revision of policy rather than for a restoration of equality.

Id. (citations omitted)(emphasis in the original).

After a careful examination of the record, however, the Court could not find any evidence

providing the necessary detail on other employees to establish they are similarly situated to Kelley.

Kelley has offered no evidence that other persons "identical in all relevant respects" were treated

different than she was.  In support of her class-of-one claim, Kelley relies on an unpublished Tenth

Circuit decision, Smith v. E. N.M. Med. Ctr., in which the Tenth Circuit held that a doctor had

adequately alleged a class-of-one violation.  In so holding, however, the Tenth Circuit conducted a

"careful analysis" of the complaint.  In this analysis, the Tenth Circuit noted that the complaint alleged

that the plaintiff-doctor had been disciplined for activity for which other doctors -- who committed

the same actions -- were not.  Unlike Smith, Kelley does not provide any specific evidence on other

employees from which the trier of fact could determine if the Defendants treated Kelley differently

from those similarly situated to her.  Although the record contains Kelley's chart of  Chavez'

appointees and Hull's list of employees, neither piece of evidence provides any detail on the reasoning

behind the hiring, firing or retention of these employees.[17]  By not providing any specific facts about

---

[17] The most detail that Kelley provides on another employee is that of another city attorney
who, despite being known to have alcohol problems and having had a sexual harassment claim
brought against him, Chavez retained after being elected his second term.  See Response ¶ 24, at 12.

the other employees, Kelley does not offer evidence showing she was similarly situated to others. Because offering evidence of being similarly situated is a prerequisite under an equal protection claim -- including those based on the "class-of-one" theory -- Kelley does not create a genuine issue of material fact whether a constitutional violation occurred.  According, the individual Defendants are entitled to qualified immunity on Kelley's equal protection clause claim.

Having held that the individual Defendants are entitled to qualified immunity, the City is  the only remaining defendant on the equal protection claim.  A governmental entity may not be held liable for constitutional violations where there is no underlying constitutional violation by any of its officers. See Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993)(citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Apodaca v. Rio Arriba County Sheriff's Dept., 905 F.2d 1445, 1447-48 (10th Cir. 1990); Watson v. City of Kansas City, 857 F.2d 690, 697 (10th Cir. 1988)); Myers v. Oklahoma County Bd. of County Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998) ("It is well established, therefore, that a municipality cannot be liable under section 1983 for the acts of an employee who committed no constitutional violation."); McCook v. Springer School District, 44 Fed Appx. 896 at 910.  In Hinton v. City of Elwood, the United States Court of Appeals for the Tenth Circuit explained "that where a municipality is 'sued only because [it was] thought legally responsible' for the actions of its officers, it is 'inconceivable' to hold the municipality liable if its officers inflict no constitutional harm, regardless of whether the municipality's policies might have 'authorized' such harm." Hinton v. City of Elwood, 997 F.2d at 782 (quoting City of Los Angeles v. Heller, 475 U.S.

---

Kelley, however, states that Chavez' failure to fire this attorney "is evidence of pretext" in regard to her Title VII discrimination and retaliation claims.  Kelley does not offer his evidence to show that she was similarly situated to this other attorney; to the contrary, it is offered -- for the purposes of her Title VII claim -- to show how Kelley was dissimilar.

at 799).

Because this Court has held that Kelley has not produced evidence that the individual Defendants in their individual capacity violated the Constitution, there can be no liability for the City or the individual Defendants in their official capacities.  There is no underlying constitutional violation.  The Court will therefore grant the City summary judgment on Kelley's equal protection claim.

Moreover, because there is no underlying constitutional violation, there can be no genuine issue of material fact on Kelley's conspiracy claims.  To establish a § 1983 conspiracy,  the plaintiff "must prove both the existence of a conspiracy and the deprivation of a constitutional right." Thompson v. City of Lawrence, Kan., 58 F.3d 1511, 1517 (10th Cir. 1995)(citing Dixon v. City of Lawton, 898 F.2d 1443, 1449 (10th Cir.1990)).  In addition, for a § 1985 violation, the Tenth Circuit has held "that infringement of some federally protected right independent of § 1985(3) is required for a violation of the conspiracy statute to be demonstrated." Holmes v. Finney, 631 F.2d 150, 154 (10th Cir. 1980)("Section 1985(3) . . . creates no rights.  It is a purely remedial statute, providing a civil cause of action when some otherwise defined federal right-to equal protection of the laws or equal privileges and immunities under the laws-is breached by a conspiracy in the manner defined by the section.")(internal quotations omitted).  Because the Court has already determined there was no underlying constitutional violation -- resulting in the absence of the "an essential element of the conspiracy claim," Thompson v. City of Lawrence, Kan., 58 F.3d at 1517, -- the Defendants are entitled to summary judgment on Kelley's conspiracy claims.

## II.   THE CITY IS NOT ENTITLED TO SUMMARY JUDGMENT ON KELLEY'S TITLE VII INTENTIONAL DISCRIMINATION AND RETALIATION CLAIMS.

A.   **KELLEY HAS RAISED A GENUINE ISSUE OF MATERIAL FACT WHETHER SHE IS AN "EMPLOYEE" WITHIN THE MEANING OF TITLE VII.**

The City's first theory for dismissal is that Kelley is not an "employee" within the meaning of Title VII.   The City contends that Kelley never gets to her prima facie case on either her discrimination claim or her retaliation claim because she is exempt from Title VII's protections.   The City alleges that she falls within the "personal staff exception" to Title VII because she is a policymaker and otherwise an immediate adviser with respect to the City's legal and constitutional powers.   In addition, it contends that, as an assistant city attorney, she had the direct ability to implement the policies and goals of the mayor and of the City.   The  City alleges that, because she is not an "employee" within the meaning of Title VII, the Court should grant summary judgment on Kelley's retaliation and discrimination claims.

Kelley concedes that she had advised the City on issues relating to liability, as well as on issues relating to city policy, including drafting portions of the City Personnel Ordinance.  Moreover, it is undisputed that the role of city attorneys is to advise policymakers on all matters relating to development and implementation of city policy.  Kelley, however, alleges that the exemption does not apply to her.  In support of this contention, she asserts that she is subject to the City's civil service laws.  The Court notes, however, that the fact Kelley was exempt from the grievance portions of the civil service laws actually cuts against her claim that she does not fall within the "personal staff" exception.  Such an exemption suggests that Kelley could be fired for any or no reason, without being entitled to Title VII protection.  The Tenth Circuit, however, has made it clear that, when determining if the "personal staff" exemption applies, the court is to consider numerous factors, of which the "plenary power[] of appointment and removal" is only one.  See Nichols v. Hurley, 921 F.2d at 1110.

-50-

The Tenth Circuit's decision in <u>Anderson v. City of Albuquerque</u> undercuts the City's assertion that Kelly is exempt from Title VII.  In this case, the mayor does not appoint Kelley; the CAO or the City Attorney appoints her.  "[T]he Mayor is prohibited from being involved in the hiring, promotion, demotion, or discharge of any city employee except those personnel hired for unclassified positions directly responsible to the Mayor."  Charter of the City of Albuquerque, Article X, § 2(b).  Kelley was not directly responsible to the mayor, but only to the City Attorney, who is directly responsible to the mayor and who the mayor appoints.  There is testimony that, while assistants may represent the City in court, the practice is that the City Attorney advises the mayor or the Council.  <u>See</u> Kelley Decl. Add. Facts ¶ 5, at 7.[18]  Moreover, Kelley offers evidence that there was little "actual intimacy [in] the working relationship between [Chavez] and [the assistant city attorneys]."  <u>Nichols v. Hurley</u>, 921 F.2d at 1110.  To the contrary, Kelley presents evidence showing that there was very little interaction between the assistant city attorneys and the mayor, and, in her view, none of the other mayors for whom she worked could place her name with her face.  This evidence suggests that the mayor and the assistant city attorneys do not have the intimate working relationship contemplated under the "personal staff" exemption.

The City argues that Kelley, by drafting amendments to the Personnel Ordinance, is a policymaker.  The City Ordinances, however, provide that the Director of Human Resources has the duty to prepare and recommend to the CAO changes in the personnel ordinance.  <u>See</u> City of

---

[18] The Court agrees with Kelley that this allegation is consistent with a reasonable reading of City of Albuquerque Ordinance § 2-7-2-2: "The City Attorney, both personally and through his or her assistant city attorneys, shall represent the city in the courts.  He or she shall also advise the Mayor and the Council as to legal matters."  Under the ordinance, the City Attorney and the assistant city attorneys represent the city in the courts.  By referring only to "He or she," a reasonable reading of the ordinance indicates that only the City Attorney, and not all of the assistant city attorneys, serve in an advisory capacity to the mayor and the city council.

Albuquerque Ordinances §3-1-3(B),(G).  In addition, Kelley offers evidence that the role of assistant city attorneys during her employment with the City is not as policymaker, but instead, only as an advisor on the policy.  Chavez testified that he never solicited a policy statement from Kelley during his first time in office.[19]  See Chavez' Depo. at 80:19-23.  Moreover, White testified that, while the assistant city attorneys advise on the policy, they do not actually decide the policy.  See White Depo. at 22:14 - 23:9.

Kelley presents sufficient evidence to create a genuine issue of material fact that the assistant city attorney position is not the "highly intimate and sensitive positions of responsibility on the staff of the elected official" that Congress contemplated when it created the personal staff exemption under § 2000e(f).  Owens v. Rush, 654 F.2d at 1375.  While the parties dispute whether Kelley is a policymaker, in light of the undisputed facts adduced herein, and the governing law on the issue, Kelley has raised a genuine issue of material fact whether she is an "employee" within Title VII's meaning and entitled to Title VII's protections.  The City, therefore, is not entitled to summary judgment.

Even if Kelley were not an employee under Title VII based on the personal staff exemption, Kelley correctly argues that she would nevertheless have a valid cause of action under NMHRA.  Thus, even if the City is correct in their interpretation of Title VII's definition of an employee, the City's argument fails with respect to the New Mexico Human Rights claim.  The Court holds that

_____

[19] In their briefing and at the hearing on the motion, the City refers to Chavez' interactions with the assistant city attorneys during his second term of office, contending that he has become more active with the department.  For the purposes of this action, however, the appropriate perspective from which to evaluate the assistant city attorneys' roles is the structure when the City employed Kelley, as opposed to changes Chavez allegedly made after Kelley left.  Even considering the changes the City alleged, however, the Court nevertheless concludes that Kelley has established a genuine issue of material fact whether she is an employee under Title VII.

Kelley is an "employee" under NMHRA, which does not have a personal staff exemption and defines an employee as "any person in the employ of an employer . . . ."

Kelley, therefore, is an employee for the purposes of the protections afforded under NMHRA, as well as under Title VII.

**B.    THE APPLICABLE STATUTE OF LIMITATIONS DOES NOT BAR THE TITLE VII CLAIMS.**

The City contends that the statute of limitations bars the Title VII claims, because more than 300 days elapsed between Kelley's participation in the EEO proceeding against Chavez' client -- the alleged protected activity -- and Kelley's termination and  the filing of Kelley's EEOC Charge.  The relevant time, however, is 300 days after the adverse employment action, which occurred in December, 2001.   See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 113.  When Kelley filed her EEOC Charge of Discrimination on May 23, 2002, it was timely and, therefore, the 300 day filing requirement does not bar her Title VII claims.

**C.    THE MCDONNELL DOUGLAS ANALYSIS APPLIES TO THE INTENTIONAL DISCRIMINATION AND RETALIATION CLAIMS.**

For both the intentional discrimination and retaliation claims, to meet her burden of proof, Kelley must satisfy the McDonnell Douglas Corp. v. Green framework.  Accordingly, Kelley must first set forth a prima facie case of retaliation and of discrimination, at which point the burden shifts to the City to articulate a legitimate, non-discriminatory reason.  The burden then shifts back to Kelley to show that the proferred non-discriminatory or non-retaliatory reason is pretext.  Because Kelley has met her burden under the McDonnell Douglas analysis, the Court will deny summary

judgment on Kelley's discrimination and retaliation claims.[20]

> **D.   KELLEY HAS MADE OUT A PRIMA FACIE CASE OF INTENTIONAL DISCRIMINATION.**

No direct evidence of intentional sexual or racial discrimination exists in this case. Accordingly, Kelley must meet her burden by indirect proof under the <u>McDonnell Douglas Corp. v. Green</u> framework.  Accordingly, Kelley must first set forth a prima facie case of discrimination.  To establish a prima facie case of intentional discrimination, Kelley must establish: (i) she belongs to a protected class; (ii) she was qualified for her job; (iii) despite her qualifications, she was discharged; and (iv) the job was not eliminated after her discharge.  Kelley has met the first three elements by offering evidence that she is a woman, she is qualified to serve as an assistant city attorney, and, despite these qualifications, she was discharged by the City.  As to the fourth element, whether her job was eliminated after her discharge, there is some evidence in the record to suggest that her transfer to the HR Department was complete at the time Chavez accepted her letter of resignation.[21] There is other evidence, however, indicating the transfer to the HR Department was not yet complete. <u>See</u> White Depo. 12:4-19.[22]  Interpreting the facts in favor of the non-moving party, the Court concludes that there is sufficient evidence to establish that the City did not eliminate Kelley's position

_____

[20] In her First Amended Complaint, as well as at the hearing on this motion, Kelley admits that Count I, the discrimination and retaliation claims, are brought only against the City.  <u>See</u> First Amended Complaint at 5; Transcript of Hearing 41:10-13.  Because Kelley did not sue Chavez or White in their individual capacities under Count I, the Court need not address whether Kelley has states a valid cause of action under NMHRA against either individual Defendant.

[21] It is not clear, based on the record before the Court, whether there was a replacement employee for Kelley's position with the HR Department.

[22] The Court notes that it is the City, and not Kelley, who included in its Undisputed Facts section that the transfer to the HR department was never completed.  <u>See</u> Defendants' Motion for Summary Judgment ¶ 37, at 8.

as Deputy City Attorney and, instead, filled the position with a Caucasian male, Randy Autio. Accordingly, Kelley has established a prima facie case of intentional discrimination.

**E.    KELLEY HAS ESTABLISHED A PRIMA FACIE CASE OF INTENTIONAL RETALIATION.**

**1.    Kelley Engaged in Protected Activity Under Title VII.**

The City contends that it is entitled to summary judgment on Kelley's retaliation claims because she did not engage in protected activity under Title VII. Kelley's alleged "protected activity" consists of her acting as a defense lawyer for the City in an unrelated EEO mediation. According to Kelley, an attorney "participates" in a Title VII proceeding and, therefore, engages in protected activity under 42 U.S.C. § 2000e-3(a)("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.").

"The starting point for [the] interpretation of a statute is always its language." Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 739 (1989). The City concedes that an application of the plain language of the statute to the case compels the result that Kelley "participated" in protected activity. See Transcript of Hearing at 15:6-23. Based on the statute's plain language, it would appear that Kelley's representation of the City in an EEO mediation session is a protected activity within Title VII's plain language.

The City criticizes Kelley for paying too much attention to the general language of the congressional statute. The Court may go beyond a statute's plain language if not doing so would lead to an absurd result. See Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 453-54 (1989)("Where the literal reading of a statutory term would compel an odd result, [the Court] must

search for other evidence of congressional intent to lend the term its proper scope.")(internal citations and quotations omitted."). As the Supreme Court of the United States has explained: "Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention, since the plain-meaning rule is rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists." Id. at 454 (internal citations and quotations omitted). The Supreme Court, however, has also emphasized that, "in interpreting a statute a court should always turn first to one, cardinal canon before all others. [The Supreme Court has] stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)(citations omitted).

Pursuant to this directive from the Supreme Court, the Tenth Circuit has held that: "It is a well established law of statutory construction that, absent ambiguity or irrational result, the literal language of a statute controls. When the meaning of a statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent. As recently noted by the Supreme Court, we must start with the assumption that legislative purpose is reflected by the ordinary meaning of the language used in the statute." Edwards v. Valdez, 789 F.2d 1477, 1481-82 (10th Cir. 1986)(citing United States v. Locke, 471 U.S. 84, 94-96 (1985)(citation omitted)). As the Tenth Circuit explained in Resolution Trust Corp. v. Westgate Partners, LTD, 937 F.2d 526 (10th Cir. 1991):

> The "absurdity" exception to the plain language rule is a tool to be used to carry out Congress' intent--not to override it. Indeed, so long as Congress remains faithful to the Constitution, it is free to enact any number of foolish statutes. It is only where a

-56-

plain language interpretation would lead to an outcome so "absurd" that Congress clearly could not have intended such an outcome, that we will employ the "absurdity" exception in order to avoid the harsh result. In effect, we presume that Congress would intend that courts not apply the plain language of a statute where it would otherwise lead to an absurdity. This link between the "absurdity" exception and congressional intent is crucial. It is not enough for a court to find that upon application of the plain meaning of a statute, a given outcome is foolish. Instead, a court so finding must be convinced that the result is so absurd that Congress, not the court, could not have intended such a result.

Id. at 529.

The Court finds that the language "any individual," "participate," and "proceeding" contained in 42 U.S.C. § 2000e-3 is plain and clear on its face. In the abstract, there is no dispute, and can be no dispute, that the phrases "any individual" "participating" in a "proceeding" is open to a broad interpretation that includes a defense lawyer participating in the protected activity, because "any individual" contains no express limitation and could be read to mean "any individual." The cardinal rule of statutory construction is that statutory language must be read in context, because a phrase "'gathers meaning from the words around it.'" Jones v. United States, 527 U.S. 373, 389 (1999)(quoting Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961)). The use of the phrase "any individual" suggests that Title VII protects more than just employees or witnesses in a protected activity. Also, Title VII uses the phrase "individual" in other places, and courts have interpreted the phrase broadly. See, e.g., McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 278-79 (1976)(relying on the fact that Title VII's terms prohibiting the discharge of "'any individual' because of 'such individual's race,' . . . 42 U.S.C. § 2000e-2(a)(1) . . . are not limited to discrimination against members of any particular race"). There is a "presumption that identical words used in different parts of the same act are intended to have the same meaning." Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 433 (1932).

Even if the Court were to decide -- which it does not -- that the language is ambiguous, the next step would be to determine whether the Court should invoke the absurdity exception and go beyond the statute's plain language.  Including Kelley's participation as a defense lawyer in an EEO proceeding within the unlawful conduct proscribed by 42 U.S.C. § 2000e-3 is not a result so absurd that Congress could not have intended such a result.  Congress could well have believed that protecting everyone involved in a protected activity was so important to the remedial structure that it was better to be overbroad rather than leave any gaps or distinctions that might narrow Title VII's protections.  "[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79 (1998).  This expansive understanding squares with the natural reading of the provision prohibiting retaliation.  The Court's interpretation is consistent with Title VII's text, structure, and history.  The Court concludes, therefore, that the statute's plain language controls and that Kelley's participation in the EEO proceeding was protected activity for the purpose of Title VII protection.

The Court should interpret Title VII, a remedial statute, broadly.  See Rutherford v. Am. Bank of Commerce, 565 F.2d 1162, 1165 (10th Cir. 1977).  "A statute which is remedial in nature should be liberally construed." Id.  In Rutherford v. Am. Bank of Commerce, the Tenth Circuit held that 42 U.S.C. § 2000e-3's reference to "employees" includes former employees for the purposes of retaliatory conduct. 565 F.2d at 1165-66.  See Berry v. Stevinson Chevrolet, 74 F.3d at 985)(holding that § 2000e-3's references to "employees" includes former employees).  Twenty years later, the Supreme Court, in Robsinson v. Shell Oil Co., 519 U.S. 337 (1997), also held that former employees were included within the term "employee" in 42 U.S.C.A. § 2000e-3.  See 519 U.S. at 346 (holding

-58-

that, although the term "employee" in 42 U.S.C.A. § 2000e-3 was ambiguous whether it referred to current as well as former employees, the statute's broader context and the "primary purpose of antiretaliation provisions: Maintaining unfettered access to statutory remedial mechanisms" dictated that former employees are included within the scope of 42 U.S.C.A. § 2000e-3).

This holding is not contrary to the recent Supreme Court decision in <u>Gen. Dynamics Land Sys. Inc. v. Cline</u>, __ U.S. __, 124 S.Ct. 1236 (2004).  In <u>Gen. Dynamics Land Sys. Inc. v. Cline</u>, the Supreme Court held that the prohibition in the Age Discrimination Employment Act ("ADEA") of "discrimina[tion] . . . because of [an] individual's age" does not include "favoring an older employer over a younger one."  <u>Id.</u> at 1240, 1248-49.  In other words, there is no reverse age discrimination claim, and the ADEA does not protect against older workers.  In reaching its conclusion, the Supreme Court looked at the legislative history, as well as invoked a new statutory interpretation, and gave its newly created "social history" analysis dispositive weight, concluding that, based on "[c]ommon experience" and "commonplace conception of American society," age discrimination is "naturally understood to refer to discrimination against the older."  <u>Id.</u> at 1243.  The Supreme Court does not define "social history," although it is apparently something different from legislative history, because the Supreme Court refers to legislative history as a separate interpretative tool in the very same sentence.  <u>See id.</u> at 1246.  Moreover, the Supreme Court has not defined "social history" in any previous or subsequent opinion.

Absent any direction from the Supreme Court to the contrary, and based on the legislative and statutory differences between the ADEA and Title VII, this Court will not extend this social history analysis to the Title VII employment discrimination context.  The Supreme Court has not used its new statutory "social history" interpretation in the context of Title VII or of other non-discrimination

statutes and, indeed, has used a contrary approach.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. at 79-80 (holding that male-on-male sexual harassment in the workplace is actionable under Title VII); McDonald v. Santa Fe Trail Transp. Co., 427 U.S. at 278-89 (holding that Title VII protects whites discriminated against in favor of racial minorities).  It does not appear that Congress was concerned about whether there were incidents of discrimination against males or that there were citation to any such incidents.  "[M]ale-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. at 79.  There does not appear to be reference in the committee reports or congressional debates on Title VII's prohibition of sex discrimination to any social problem requiring a federal statute to correct arising out of excessive male-on-male sexual harassment.  To adopt the Supreme Court's "social history" to Title VII would lead the Court away from well-settled principles of statutory interpretation of Title VII.  Thus, rather than looking through Title VII's historical background, the Court concludes that it should start with the text of § 2000e-3 itself, and if "the words of [the] statute are unambiguous," the Court's "judicial inquiry [would be] complete."  Conn. Nat'l Bank v. Germain, 503 U.S. at 253-54 (internal quotation marks omitted).  The Court should not depart from long accepted methods of interpreting Title VII without clear direction from the appellate courts.

It is true that Congress' interpretative clues almost unanimously point to an understanding of retaliation against workers and witnesses involved in protected activity.  But unlike in Gen. Dynamics Land Sys. Inc. v. Cline, social history does not emphatically reveal an understanding of retaliation aimed only against workers and witnesses, and the legislative history confirms that the statutory reference to "any individual" should not be given an unnaturally narrow meaning.  Because the City

has not presented a social reason why the Court should avoid Title VII's plain language, the Court will rest its decision on Title VII's language and structure.

In light of the rules of statutory construction and the broad interpretations afforded to remedial statutes, the Court concludes that a defense lawyer's participation in an EEO proceeding is protected activity under Title VII. Kelley, therefore, has established that she engaged in protected activity.

**2.      Kelley Has Shown a Genuine Issue of Material Fact Whether She Suffered an Adverse Employment Action.**

The City contends that it is entitled to summary judgment because Kelley did not suffer an adverse employment action. The City contends that, because Kelley submitted a resignation, in response to Chavez' demand that she resign, Chavez did not terminate her. The undisputed testimony is that Kelley thought about whether to submit a letter of resignation. She dwelled on the issue for some time, and when she ultimately chose to submit the letter, she submitted it with a letter asking the mayor not to accept it and attached a copy of her resume.

Kelley, however, offered evidence that she felt forced to submit the letter of resignation. There is thus sufficient evidence in the record to create a genuine issue of material fact whether Kelley submitted the letter involuntarily, such that her ultimate termination was an adverse action.

**3.      There is Sufficient Evidence to Establish a Causal Relationship Between the Alleged Protected Activity and Any Adverse Action.**

Kelley alleges retaliation based on her defense of an unrelated discrimination claim to which Chavez was opposing counsel in July, 2000. Chavez was not in a position to terminate Kelley's employment until his election and taking office in December, 2001. The City seeks dismissal because they contend that the time between her participation in the EEO proceeding and her dismissal 18

months later is too great to prove in and of itself any retaliatory motive.  The City contends that the Court must dismiss Kelley's retaliation claim because there can be no causal connection between her alleged protected activity and her resignation.  The City alleges that Kelley has provided no more than her suspicions and speculations regarding the City's motives for the alleged "employment action;" such conjecture does not suffice to create a genuine issue of material fact as a matter of law.

Kelley, however, offered evidence that, within days of taking office, Chavez dismissed Kelley from City employment.  Additionally, Kelley has direct evidence of retaliation from statements that White made to her -- indicating that Kelley's position would be in jeopardy if Chavez was elected -- by circumstantial evidence of retaliation based upon the timing of her termination, and by conflicts in White's and Chavez' testimony concerning whose decision it was to terminate her employment. Kelley also has circumstantial evidence of retaliation, because only the CAO of the City has authority to terminate Kelley under City Personnel Rules.

The Court finds that Kelley has offered sufficient evidence to create a genuine issue of material fact whether there was a causal relationship between the protected activity and the adverse employment action.

**F.    THE CITY HAS ARTICULATED A LEGITIMATE, NON-DISCRIMINATORY BUSINESS REASONS FOR ACCEPTING HER RESIGNATION AND FOR THE TERMINATION.**

Although Kelley is an "employee" under Title VII and the NMHRA, and she has established her prima facie case of discrimination and retaliation, the City contends that it has articulated a legitimate, nondiscriminatory business reason for accepting her resignation and for her termination. The City relies upon Chavez' subjective testimony concerning Kelley's performance and the mayor's active and interactive use of city attorneys, particularly in this his second term.

The City contends that Kelley held a policymaking and confidential position as an assistant city attorney.  The City alleges that, because the City employed Kelley as assistant city attorney, which is a position of confidence with the City and with the mayor, she, therefore, was subject to termination on the basis of the mayor's legitimate, non-discriminatory need for legal staff with whom he could work and that reflected his view of the functions of the attorney's office.  Chavez stated his desire to change the city attorneys office to better reflect his views of the present status and appropriate functions of that office.  Likewise, he articulated that he wanted to be able to work closely with the attorneys and that he expected loyalty.  The mayor's decision to accept Kelley's resignation was predicated on an exercise of discretion regarding the legal staff he preferred, specifically a staff with which he believed he could work and one that would reflect his views of the office and be a representative of the City.  As the mayor noted, Kelley did not fit this vision.

Chavez stated that he did not look favorably on Kelley's abilities as a lawyer, nor did he believe she reflected his view of how a public lawyer should conduct herself.  The City contends that Kelley did not meet the criteria the mayor felt was necessary for effective legal counsel for either himself or the City.

The City alleges that Chavez is entitled to have an attorney's office with whom he can work, and with whom he is assured will reflect his view of the functions of the office,  specifically as representatives of the mayor and the city in the eyes of the public.  Cf. Elrod v. Burns, 427 U.S. 347, 364-66 (1976); Branti v. Finkel, 445 U.S. 507, 517 (1980)(addressing whether the plaintiff's private political beliefs would conflict with official functions); Rendish v. City of Tacoma, 123 F.3d 1216, 1225 (9th Cir. 1997)(First Amendment case)(concluding that city's interest in effective and efficient fulfillment of its public responsibilities outweighed attorney's interest in pursuing litigation against

a city).

The City has articulated a legitimate, non-discriminatory reason for the acceptance of Kelley's letter of resignation.  To survive the City's motion for summary judgment on the retaliation and discrimination claims, therefore, Kelley must establish a genuine issue of material fact whether this legitimate, non-discriminatory reason is pretext.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 510-11.

### G.   KELLEY HAS ESTABLISHED A GENUINE ISSUE OF MATERIAL FACT THAT THE CITY'S PROFERRED REASONS FOR HER TERMINATION ARE PRETEXT.

Kelley contends that the City fired her because she did not settle a discrimination case that Chavez was prosecuting as a private attorney.  Kelley has both direct and circumstantial evidence that the reason the City gives is pretext based upon the timing of the termination, the angry manner in which Chavez abruptly terminated an EEOC mediation in which she participated, her previous good performance as an assistant city attorney according to White, the statements that White made to Kelley, and the statements that White made to Kelley's prospective employer that her termination was based upon a "personality conflict" between Chavez and Kelley.  Kelley also offers as evidence of pretext Chavez' retaining a male attorney who was an alcoholic and the City's settling a sexual harassment charge against him.  Kelley also offers as evidence of pretext that Chavez could not give a reason for his conclusion that Kelley was not an "outstanding" attorney.  In addition, Kelley presents as evidence of pretext that Chavez did not know in what field of expertise Kelley worked as an assistant city attorney and could not recall any private conversations with her during his first term.  Moreover, Kelley notes that Chavez has set a policy that the City will not settle police cases.

Kelley has established a fact issue concerning pretext.  The City, therefore, is not entitled to

-64-

summary judgment on Kelley's intentional discrimination and retaliation claims.

III.   **TO THE EXTENT KELLEY ALLEGES A TITLE VII DISPARATE IMPACT CLAIM, THE CITY IS ENTITLED TO SUMMARY JUDGMENT.**

To the extent that Kelley relies on statistical evidence of race and gender discrimination to support a discrimination claim on the basis of race and/or gender -- i.e., that Chavez and White discriminated against Kelley on account of her race and gender and that statistics of their hiring/appointments since Kelley left the City's employ is proof thereof -- Kelley has failed to meet a prima facie case. "To establish a prima facie case of disparate impact discrimination, plaintiff must prove a specific identifiable employment practice or policy caused a significant disparate impact on a protected group. Plaintiff may rely on statistics to support his case, but any statistical analysis must involve the appropriate comparables . . . and must cross a threshold of reliability before it can establish even a prima facie case of disparate impact ." Chavez v. Coors Brewing Co., 1999 WL 162606, at **3. Moreover, although a plaintiff may use "statistics alone . . . to establish a prima facie case of racial[/gender] discrimination in a disparate treatment case[,] . . . a plaintiff must show gross statistical disparities in such cases. When the plaintiff offers other evidence of discriminatory intent, however, the grossness of the disparity need not be as great." Denison v. Swaco Geolograph Co., 941 F.2d 1416, 1424 (10th Cir. 1991)(internal citations and quotations omitted). The City contends that the statistical evidence Kelley proffers is insufficient to create a jury question whether the City discriminated against Kelley on either basis.

Kelley's statistical evidence does not demonstrate a pattern of discriminatory conduct by the City to support a prima facie case based on disparate impact. At the time that Chavez accepted Kelley's resignation, Chavez had accepted the resignation of an Hispanic woman, undercutting

Kelley's claim of race discrimination.  Likewise, since his administration began, the City has hired eight female Caucasians to the attorney's office.

In this case, Kelley's statistical evidence is insufficient to raise a jury question on either basis asserted.  In and of itself, Kelley's small sample size does not eliminate all non-discriminatory explanations for Kelley's perceived disparities on grounds of race and gender.  Accordingly, the City is entitled to summary judgment on Kelley's Title VII disparate impact claims of gender and race discrimination.

In summary, the Court will grant the individual Defendants and the City summary judgment on the equal protection clause claim and the conspiracy claims under § 1983 and §1985.[23]  The Court will also grant summary judgment insofar as it is based on discrimination based on disparate impact. The Court, however, will deny the City summary judgment on the Title VII and NMHRA intentional discrimination claim and the retaliation claim.

**IT IS ORDERED** that the Defendants' Motion for Summary Judgment is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Donald Sears
Steven K. Sanders
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

---

[23] Kelley did not sue Chavez and White under Count I, so the Court need not address whether they are entitled to summary judgment on the claims under NMHRA.

Kevin M. Brown
Daniel J. Macke
Brown & German
Albuquerque, New Mexico

*Attorneys for the Defendants*